48 So.2d 546

**SMITH v. SMITH.**

**5 Div. 487.**

Supreme Court of Alabama.

Oct. 26, 1950.

L. J. Tyner, of Opelika, and Martin, Turner & McWhorter and J. C. Blakey, of Birmingham, for appellant.

Glenn & Glenn and Walker & Walker, of
Opelika, for appellee.

STAKELY, Justice.

On December 9, 1948 Jesse W. Smith, Jr. (appellee), a man approximately 50 years of age and who is the only child of Jesse W. Smith, Sr. (appellant), filed in the Probate Court of Lee County, Alabama, a petition of inquisition seeking to have his father declared to be of unsound mind. The case came on for hearing before a six man jury on the petition of appellee and appellant's answer denying each and every allegation of the petition. At the conclusion of the evidence the jury rendered a verdict finding the allegations of the petition true and that appellant was of unsound mind. Pursuant to such verdict the court on January 21, 1949 entered a judgment finding appellant to be of unsound mind. On January 25, 1949 Sam Morgan, a disinterested person, was appointed guardian of the estate of appellant, the appellee having waived his right as next of kin to such appointment. The appellant's motion for a new trial was overruled and the appellant prosecutes this appeal.

Motion to Dismiss the Appeal.

The case is submitted in this court not only on the merits but on the appellee's motion to dismiss the appeal. The motion is based on the theory that the appeal was not taken in the name of Jesse W. Smith, Sr., by next friend or general guardian as provided by § 786, Title 7, Code of 1940, and because the record does not show that the appeal was in fact taken by appellant as provided by § 792, Title 7, Code of 1940.

The record shows that a bond for costs of appeal was filed containing recitals that judgment was rendered adjudging Jesse W. Smith, Sr. to be a person of unsound mind, that judgment was rendered overruling the motion for a new trial filed by the respondent Jesse W. Smith, Sr. and that Jesse W. Smith, Sr. has taken an appeal to the Supreme Court of Alabama from both of the aforesaid judgments. The bond was executed by L. J. Tyner, attorney for Jesse W. Smith, Sr., principal, and by two persons as sureties. This bond was taken and approved by the Judge of Probate.

■ It is vigorously contended that § 786, Title 7, Code of 1940 provides the exclusive method by which an appeal can be taken to this court in a proceeding of the kind now under consideration. Of course an appeal is statutory and no appeal lies unless provided by statute, State v. Seminole Bottling Co., 235 Ala. 217, 178 So. 237, but we do not think that the motion to dismiss the appeal is well taken. There is no requirement in § 786, Title 7, Code of 1940 that the appeal in a case of this kind must be taken by the next friend or general guardian or guardian ad litem. This section merely provides that such a representative may take an appeal.

In § 11, Title 21, Code of 1940, it is contemplated that the alleged non compos mentis may be represented by counsel. It is only when such person is not represented by counsel that the court is obligated under the statute to appoint a guardian ad litem to represent and defend such person. It is obvious that it is the duty of counsel to represent and protect the interests of the person alleged to be of unsound mind, just as if counsel was a guardian ad litem. When this statute is taken in connection with § 782, Title 7, Code of 1940, it is clear to us that the appeal, as was done in the present case, may be taken by counsel on behalf of the respondent by giving security for the costs of the appeal to be approved as provided in the statute. This section provides that the appeal be taken by the appellant or "some one for him". As pointed out this is what the respondent did in the present instance.

■ Furthermore the appeal here is for the purpose of reviewing the validity or legality of the judgment adjudging the respondent to be of unsound mind. Ordinarily it is true that one adjudged a non compos mentis can only act through a recognized representative but this is not the case where the very object of the action is to determine whether the person alleged to be of unsound mind is in fact a person of unsound mind. Shapter v. Pillar, 28 Colo. 209, 63 P. 302.

The motion to dismiss the appeal must be overruled.

■ I. The appellant urges with great earnestness that the trial court was in error in overruling the motion for a new trial because the verdict of the jury was contrary to the great weight of the evidence. Where there is evidence which if believed justifies the verdict, a motion for a new trial is properly overruled. Johnson v. Louisville & Nashville R. R. Co., 240 Ala. 219, 198 So. 350; Kurn v. Counts, 247 Ala. 129, 22 So.2d 725. Verdicts are presumed to be correct and no ground of new trial is more carefully scrutinized or more rigidly limited, than that the verdict is against the evidence. Cobb v. Malone, 92 Ala. 630, 9 So. 738. It is recognized by this court that when the presiding judge refuses, as here, to grant a new trial, the presumption in favor of the correctness of the verdict is strengthened. Bell v. Nichols, 245 Ala. 274, 16 So.2d 799; Southern Railway Co. v. Kirsh, 150 Ala. 659, 43 So. 796.

■ It is well to keep in mind that there was no burden upon the appellee to show in the court below that the appellant was a lunatic or an idiot as those terms are ordinarily accepted. As early as 1870 the Supreme Court of Alabama following the text of Story on Eq., § 1365, announced the following rule applicable to this case.

"The commission (of lunacy) is not confined to idiots or lunatics, strictly so-called; but in modern times it is extended to all persons who, from age, infirmity, or other misfortune, are incapable of managing their own affairs, and therefore are properly

deemed of unsound mind, or non compos mentis." Fore v. Fore, 44 Ala. 478.

The test of incompetency has been well stated as follows: "It is sufficient if, for any cause, his mental faculties have become so impaired as to make him incapable of protecting himself or properly managing his property or affairs, and where, by reason thereof, he would be liable to be deceived or imposed on by artful or designing persons." 44 C.J.S., Insane Persons, § 11, pp. 64-65.

Of course it should never be forgotten that the right to control one's property is a sacred right which should not be taken away without urgent reason. In re Mills, 250 Wis. 401, 27 N.W.2d 375.

There was much evidence introduced on both sides of the case. It would serve no good purpose to attempt to set it all out here in detail. For purposes of this discussion evidence favorable to the petitioner may be summarized as follows. The appellant Jesse W. Smith, Sr. is 77 years of age and has for many years resided in Opelika, Alabama. His wife had been dead for about three years. He had been a shrewd business man and had accumulated an estate in cash, government bonds and real estate worth approximately $100,000. He owned and for many years operated a hotel in Opelika known as the Park Hotel. He has only one child, a son Jesse W. Smith, Jr., the appellee, who has a wife and two children, a daughter about 21 years of age and a son 7 years of age. This granddaughter is married and has two small children. The wife of appellant's son worked at the hotel for about 15 years without pay until about two years before this suit was instituted. The appellant deeded to her a home in Opelika worth about $10,000 and gave his son money on various occasions aggregating $1750.00.

Tendencies of the evidence show that the appellant's accumulation of property was considerably due to his wife's constant, unpaid, heavy work at the hotel for many years. Tendencies of evidence further showed that she died from causes brought on by malnutrition. Tendencies of evidence further showed that the appellant showed moral and mental deterioration. He became enamored of a certain woman and his conduct was such that his wife was afraid he was going to kill her. Without cause he demanded a divorce from his wife. He then took up with another woman who lived in Opelika. He told his wife that he wanted her to get out and let him marry this woman and that he wanted to give her all the proeprty. His wife, although a sick woman, refused to do this, saying that she had helped him to make what he had and that she was not going to get out and let another woman have it.

During the last illness of his wife he insisted that he and she live in the cafe part of the hotel, a large room 25 feet by 60 feet with a showcase window therein. The cafe at that time was not being operated. His wife was compelled to occupy a single narrow cot with appellant, although there were approximately 15 furished, unoccupied bedrooms in the hotel, at least one of which was on the first floor, which had been previously occupied by appellant and his wife for about 20 years. Although he was a man of considerable means and although both he and his wife were quite sick, he did what cooking was done, ordering a few outside meals, but living chiefly on sandwiches, crackers and canned goods. Numerous friends visited appellant and his wife during this period, interested themselves in their behalf and got word of their condition to appellant's son, the appellee, who was at this time doing war work in Key West, Florida in the Navy Yard. These persons testified that the appellant was a man of unsound mind.

When he received word of the condition of his parents, the appellee returned to Opelika and carried them to his home in Key West where both recovered strength. On this trip, however, the appellant suffered a cerebral hemorrhage due to arteriosclerosis, so that there was an impediment in his speech which tendencies of evidence showed had some effect on his mentality. The appellant insisted upon returning to Opelika where he had no one to look after him. His wife soon followed and died

thereafter in about April or May 1946 in an insane asylum.

In order to look after his father, the appellee gave up his position in Key West and returned to Opelika. In May 1947 the appellant leased to his son for four years the hotel, reserving three rooms on the first floor at the rear of the hotel as his own apartment. The son spent considerable money renovating the cafe and hotel and opened the same for business. Appellant captiously refused to turn over to his son all of the leased premises, making the operation of the hotel unprofitable. Throughout this portion of appellant's life, tendencies of evidence showed that the appellant was drinking whiskey to great excess which the doctor did not consider it wise to reduce on account of his condition. On a certain Sunday appellant insisted on drinking his son's beer in the cafe (the cafe being closed for business), when he should have known that to do so would jeopardize his son's license. The son was unable to explain this to his father and it was necessary to remove him from the cafe.

At about this time the appellant began to stay a great deal of his time at the Midway Tavern, operated by Mr. Bob Wells. He called his daughter-in-law Mrs. Jesse W. Smith, Jr., to come out to see him and there he presented Mrs. Wells (a married woman) to his daughter-in-law saying: "Don't you think that she is pretty? This is just my type and this is my Sugar. I am going to live out here with my Sugar." His mental condition continued to deteriorate and the last time his daughter-in-law visited him there he did not recognize her or her companions. From that time on he would never go to the home of his son and daughter-in-law, although they asked him to do so.

About November, 1948, he told appellee and appellee's wife that he had given Mrs. Bob Wells $18,000 in bonds. The appellee offered in evidence a bank book showing that on October 15, 1947, the sum of $18,235.00 was deposited in the bank to the credit of Mrs. Martha Charles Wells (Mrs. Bob Wells). The evidence tended to show that this money was the proceeds of U. S.

Bonds that the appellant had given to Mrs. Wells. This money was drawn out of the bank by Mrs. Wells when the present suit was started.

J. Z. Fuller, President of the Farmers' National Bank of Opelika, testified that in July, 1948, appellant asked the witness to write the Federal Reserve Bank or the U. S. Treasurer to find out what bonds had been issued to him and cashed. The appellant told Fuller that he had had about $25,000 worth of bonds. It appeared from this conversation that appellant did not know what had become of his bonds and wanted them traced. On a previous inquiry by the appellant of this banker, Mrs. Wells had told appellant in the presence of Mr. Fuller that the bonds were cashed at Tuskegee. Tendencies of evidence show that appellant had had 35 U. S. Bonds in the principal sum of $1,000 each and about $8,000 in $1,000 bills. Tendencies of evidence showed that appellant had disposed of all of these bonds and bills and did not know what had become of them, except as to the $18,000 which Mrs. Wells had received, as shown by the bank records. Mrs. Wells did not testify in the case. Tendencies of the evidence further showed that the appellant had given Mrs. Wells a new automobile worth about $3,000, his Haviland china and his silver consisting of 156 pieces. He did not remember what else he had given her. Although he complained to the witness Fuller and to doctors who examined him that others had gotten his bonds without his knowledge, he testified at the trial that he "still had lots of bonds."

On December 3, 1948 the appellant placed a notice in the Opelika Daily News, an afternoon newspaper, that all of his "real estate was for sale." After this notice appeared, the appellee filed the petition in the present case, alleging that because of mental and physical senility and incompetence, his 77 year old father was incapable of governing himself and of conducting and managing his affairs.

A considerable number of lay witnesses testified that the respondent was a person of unsound mind. Dr. B. S. Bruce, a general practitioner, also so testified. About an equal number of lay witnesses gave their

opinion that the respondent was of sound mind. Tendencies of the evidence showed that the appellant was well cared for by Mrs. Wells and her husband at the Midway Tavern. In addition to these witnesses, there was introduced in evidence on behalf of respondent the testimony of several physicians who were specialists in mental and nervous diseases. All of these specialists gave it as their opinion that the respondent was of sound mind.

It is very earnestly insisted that the great weight of the evidence was against the verdict of the jury not only because the evidence of insanity was of a nebulous and uncertain character, but especially because of the testimony of the specialists. It is, of course, true that where the evidence of specialists is in conflict with the testimony of lay witnesses on the issue of insanity, the court is prone to accord more weight to the testimony of the specialists than to the testimony of non-expert witnesses. Box v. Box, 253 Ala. 297, 45 So.2d 157. But the rule to which we have referred is not an inflexible rule. The opinions of expert witnesses as to insanity are not conclusive on the jury, but are to be weighed like other evidence and the jury may reject all expert testimony, though it is without conflict. Hockenberry v. State, 246 Ala. 369, 20 So.2d 533; George v. State, 240 Ala. 632, 200 So. 602. The jury may treat the testimony of experts as it deems best in connection with the facts and circumstances of the case. Metropolitan Life Ins. Co. v. Chambers, 226 Ala. 192, 146 So. 524; Atlantic Coast Line R. Co. v. Jackson, 225 Ala. 652, 144 So. 813. In other words the judgments of experts or the inferences of skilled witnesses even when unanimous and uncontroverted are not necessarily conclusive on the jury. Commonwealth Life Ins. Co. v. Harmon, 228 Ala. 377, 153 So. 755.

In addition to the various witnesses the respondent testified in the case. The jury saw and heard him.

We have considered the evidence with great care and we have concluded that it was for the jury to say whether the evidence reasonably satisfied them that the respondent was of unsound mind within the definition which we have laid down. It may be added that the court in its oral charge to the jury gave the definition of insanity which we have approved. Not only was there no exception to the oral charge but counsel for the respondent announced in open court satisfaction with the charge.

Upon a careful consideration, we are not willing to say that the preponderance of the evidence against the verdict is so decided as to clearly convince us that it is wrong and unjust. Under all the circumstances, we do not feel authorized to reverse the judgment of the trial court in refusing a new trial. Bell v. Nichols, 245 Ala. 274, 16 So.2d 799.

II. The present case was tried before a six man jury as provided in the Act to amend § 12, Title 21, Code of 1940, as it appears in the General Acts of 1945, p. 704. Code of 1940, Tit. 21, § 12, Pocket Part. It is contended that the amendment providing for a jury of six men in an insanity inquisition is unconstitutional in that it is in conflict with § 11 of the Constitution of 1901, which provides that "the right of trial by jury shall remain inviolate." The appellant went to trial before the jury of six men without making any objection that he was not satisfied with the jury or that he demanded a jury of twelve men. But pretermitting questions of waiver, which are insisted upon by the appellee, we think that the appellant has not been deprived of any constitutional rights. It is true that the statute providing for a trial by a jury of twelve men in inquisition proceedings was in effect at the time of the adoption of the Constitution of 1901 and the jury contemplated by § 11 of the Constitution of 1901 is a common law jury of twelve men, Kirk v. State, 247 Ala. 43, 22 So.2d 431, but while inquisition of lunacy under the statute partakes of the nature of a civil action, it is a proceeding sui generis. Sorter v. Austen, 221 Ala. 481, 129 So. 51.

In other words under modern practice, the property rights of the adjudged incompetent are not affected by an adjudication of insanity. 28 Am.Jur. § 17, p. 666. On the contrary, as heretofore

pointed out, the very purpose of the inquisition proceeding is ultimately to appoint a guardian to preserve the property of the incompetent. § 9, Title 21, Code of 1940. "It is not a case in which he is adjudged at fault, or in default, and for which there is a forfeiture of liberty or property, but only a method by which the public discharges its duty to a citizen." State v. Linderholm, 84 Kan. 603, 114 P. 857.

While there appears to be some conflict in the authorities, in numerous jurisdictions the existence of the right of jury trial in proceedings to adjudicate insanity or incompetency is denied on the ground that no such right existed at common law, except in cases of escheats to the crown. Sharum v. Meriwether, 156 Ark. 331, 246 S.W. 501; Re Liggett, 187 Cal. 428, 202 P. 660; Re Shackleford, 188 Cal. 279, 204 P. 822; Re O'Connor, 29 Cal.App. 225, 155 P. 115; Re Bundy, 44 Cal.App. 466, 186 P. 811; Ex parte Scudamore, 55 Fla. 211, 46 So. 279; Re Dowdell, 169 Mass. 387, 47 N.E. 1033, 61 Am.St.Rep. 290; Groves v. Ware, 182 N.C. 553, 109 S.E. 568; Hagany v. Cohnen, 7 Ohio Dec. Reprint 88; Id., 29 Ohio St. 82; State v. Linderholm, 84 Kan. 603, 114 P. 857; Ex parte Dagley, 35 Okl. 180, 128 P. 699, 44 L.R.A.,N.S., 389; Ex parte Linke, 35 Okl. 192, 128 P. 702; Re Idleman, 146 Or. 13, 27 P.2d 305; Gaston v. Babcock, 6 Wis. 503; Crocker v. State, 60 Wis. 553, 19 N.W. 435. In Re O'Connor, supra, is a statement which perhaps explains the basis for the opinion that the right to a jury trial in a proceeding of this kind did not exist at common law. 91 A.L.R. p. 89.

In Ex parte Thompson, 228 Ala. 113, 152 So. 229, 231, an attorney was disbarred from the practice of law on trial before the Board of Commissioners of the State Bar without trial by jury. In its opinion this court pointed out that, "A provision for jury trial in disbarment proceedings has been brought forward in every Code of this state, certainly down to 1923."

It was insisted on behalf of petitioner that the right of trial by jury as provided by § 11 of the Constitution of 1901 extended not only to all cases in which the prerogative existed at common law but to all cases where this right was secured by statute at the time the constitution was adopted. This court made an elaborate analysis of the decisions of courts of other states and said:

"In considering this question, the nature of the proceedings, as well as the nature of the action, must be borne in mind. The action for disbarment of an attorney is neither, strictly speaking, a civil action, nor is it a criminal one. It is sui generis in nature. The purpose of the proceedings is not for recovery of property or damages, on the one hand, nor is it designed for punishment on the other. Its whole object is to purge the bar of a member who, it is supposed, has, since his admission, become unfit to longer remain a member of the bar.

\* \* \* \* \* \*

"This brings us down to a review of the conclusion reached on this point by our sister state Mississippi. Mississippi and Alabama, as heretofore pointed out, were created out of what was known as Mississippi territory, Mississippi in 1817 and Alabama in 1819. The Territorial Act of 1807, providing for jury trial of attorneys charged with malpractice, was in force for ten years in this territory before Mississippi was admitted into the Union. Upon investigation, we find that the present statute law of Mississippi does not provide for a trial by jury of an accused attorney. We further find that, in the case of Ex parte Cashin, 128 Miss. 224, 90 So. 850, 852, the attorney was disbarred by the court, without intervention of a jury. The court in that case used this pertinent language on the subject of the right of the accused to a trial by jury: 'The court has the power to protect itself against an unfit attorney, an officer of the court, \* \* \*. The exercise of the power of the court in hearing and determining whether the attorney shall be disbarred *is not in contravention of the constitutional right of trial by jury.* \* \* \*'

\* \* \* \* \* \*

"The proceeding for the disbarment of an attorney, strictly speaking, is neither

civil nor criminal. It is of a sui generis nature, on account of the relation of the attorney to the court. .* * *

"In reaching our conclusions, we have not overlooked the case of Montgomery & Florida R. Co. v. McKenzie, 85 Ala. 546, 5 So. 322, nor the cases of Alford v. State, 170 Ala. 178, 54 So. 213, Ann.Cas. 1912C, 1093, State v. Bley, 162 Ala. 239, 50 So. 263, and Costello v. Feagin, Judge, 162 Ala. 191, 50 So. 134. Suffice it to say that the court, in those cases, was not dealing with the matter of disbarment, an inherent power of the court, and, a proceeding sui generis. Nothing stated in those cases could be held to affect the question here considered." Ex parte Thompson, supra [228 Ala. 113, 152 So. 232].

We feel that the reasoning used by this court in the Thompson case applies to the situation in the case at bar. In both situations the courts have traditionally had complete control of the situation unless restricted by statute. In such situations this court has recognized the right of the legislature to provide for an appropriate procedure. Neither is a situation in which a trial by jury was recognized at common law. If the legislature can provide for a board of commissioners of the organized bar of the state to hear disbarment cases, despite the fact that when the Constitution of 1901 was adopted a jury trial was provided by statute in disbarment proceedings, it can also provide for a jury of six men in insanity inquisitions despite the existence of a statute providing for a jury of twelve men when such constitution was adopted.

We think clearly that there has been no violation of § 11 of the Constitution of 1901.

Other assignments of error raise propositions which we have considered very carefully but which we feel require no discussion since we think them without merit.

We conclude that the judgment of the lower court must be affirmed.

Affirmed.

BROWN, FOSTER, LIVINGSTON, LAWSON and SIMPSON, JJ., concur.