632 So.2d 577 (1993)
Ex parte Arthur Lee GILES.
(Re Arthur Lee Giles v. State.)
1920375.
Supreme Court of Alabama.
October 29, 1993.
On Application for Rehearing January 14, 1994.
*578 Bernard E. Harcourt, Montgomery, and Herbert B. Sparks, Jr., Birmingham, for petitioner.
James H. Evans, Atty. Gen., and Melissa G. Math, Deputy Atty. Gen., for respondent.
ADAMS, Justice.
We granted Arthur Lee Giles's petition for certiorari review of a judgment of the Court of Criminal Appeals affirming his sentence of death. We affirm.
The operative facts forming the basis for Giles's conviction have already been set forth in a number of opinions. The facts are that at approximately 3:27 a.m. on November 10, 1978, Arthur Giles and Aaron Jones, armed with handguns and a knife, entered a home occupied by Carl and Wilene Nelson; their three children, Tony, 13-year-old Brenda, and 10-year-old Charlie; and Carl's mother, 86-year-old Annie Nelson, with intent to rob the family. Giles entered Tony's bedroom and turned on the light. Some conversation followed, which awakened Carl Nelson, who then ordered Giles out of the house.
*579 Tony followed Giles as he exited through the rear door of the house. As Tony stepped onto the porch, Giles shot him in the chest. Giles then reentered the house, but not before shooting Tony a second time as he lay on the porch.
Once back inside the house, Giles encountered Annie Nelson, who had awakened and was standing in the doorway of Charlie's bedroom. He shot her in the face. Giles then proceeded to another bedroom, occupied by Carl, Wilene, and Brenda. There, he shot Wilene and Carl NelsonWilene in the left shoulder, and Carl through the left arm and the heart. Brenda, who was lying on her mother's bed, covered her face with a pillow. Giles pulled the pillow away from her face and shot her in the left eye.
Carl and Wilene, both of whom were still alive, were then stabbed repeatedly. Charlie ran into the melee and leaped onto the bed with Brenda, where he was subsequently stabbed twice in the back. Brenda, notwithstanding her pleas for mercy, was also stabbed.[1]
After Giles and Jones had left the house and driven away, Tony, who had managed to crawl underneath his father's truck for safety, went to the house in search of his family. Inside, he found all the family members covered with blood, having been shot, stabbed, or both. Carl and Wilene were dead. Carl had been shot twice and stabbed eight times. Wilene had been shot once, stabbed 17 times, and "slashed" 12 times. A number of them had also been bludgeoned about their heads. Tony managed to get medical attention for himself and the other survivors.
In separate trials, Jones and Giles were both convicted, pursuant to Ala.Code 1975, § 13-11-2(a)(10), for the capital murders of Carl and Wilene Nelson, and both men were sentenced to death by electrocution. Jones v. State, 403 So.2d 1 (Ala.Crim.App.1981), on return to remand, 520 So.2d 543 (Ala.Crim. App.1984), affirmed, Ex parte Jones, 520 So.2d 553 (Ala.), cert. denied, Jones v. Alabama, 488 U.S. 871, 109 S.Ct. 182, 102 L.Ed.2d 151 (1988); Giles v. State, 405 So.2d 50 (Ala.Crim.App.1981), on return to remand, 554 So.2d 1073 (Ala.Crim.App.1985), sentence reversed, Ex parte Giles, 554 So.2d 1089 (Ala.1987), on second return to remand, Giles v. State, 632 So.2d 568 (Ala.Crim.App. 1992). The Court of Criminal Appeals reversed both convictions and remanded for new trials in light of the bifurcated procedure outlined by this Court in Beck v. State, 396 So.2d 645 (Ala.1980). Jones, 403 So.2d 1; Giles, 405 So.2d 50. Following a second trial, Jones was again convicted and sentenced to death. 520 So.2d 543. This Court affirmed Jones's second conviction and death sentence. 520 So.2d 553.
Giles's second trial, which occurred in December 1982, also resulted in a conviction and sentence of death, both of which were affirmed by the Court of Criminal Appeals. 554 So.2d 1073. This Court affirmed the judgment of the Court of Criminal Appeals as to Giles's conviction. 554 So.2d 1089. As to the sentence, however, we reversed and remanded, holding that the trial court had "impermissibly suggested to the jury that [it] favored a death sentence in the case." Id. at 1092.
Following the sentencing hearing conducted on the second remand, the jury, after considerable deliberations, informed the court that it had "reached an impasse." The judge then questioned the jurors, individually, whether further deliberations would be fruitless. Concluding that further deliberations would not produce a unanimous verdict, the judge dismissed the jury. That result represented a de facto recommendation of life without the possibility of parole, as we interpreted §§ 13-11-1 to -9 in Beck v. State. However, at a subsequent sentencing hearing, the trial judge sentenced Giles to death.
The Court of Criminal Appeals affirmed the sentence. Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992). Pursuant to Ala.Code 1975, §§ 13A-5-53 to -55, and Ala.R.App.P. 39(c), we granted Giles's petition for certiorari review of that judgment.
*580 Giles contends that Ala.Code 1975, §§ 13-11-1 to -8, the sentencing scheme in effect at the time of the murders in this case, did not expressly authorize the trial judge to override the jury's de facto sentence of life imprisonment. Therefore, he insists, the death sentence cannot be imposed.
In Ex parte Hays, 518 So.2d 768 (Ala. 1986), we addressed arguments substantially identical to those propounded by Giles. In that case, we held that §§ 13-11-3 and -4 authorized the trial judge to override the jury's recommendation of imprisonment, if, after independently reviewing the mitigating and aggravating factors, he concluded that the death penalty was warranted. 518 So.2d at 775-76. Because Giles's arguments have been thoroughly discussed and decided, we will not revisit those contentions here.
Giles further contends that the de facto sentence of life imprisonment resulting from the jury's failure to agree unanimously on a death sentence is protected by Ala. Const. 1901, § 11, which provides: "That the right of trial by jury shall remain inviolate." Therefore, he insists, § 11 prohibits the judicial override of that verdict and the consequent entry of a sentence of death. For this proposition, he cites Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), in which we held that Ala.Code 1975, § 6-11-21, which limited to $250,000 an award of punitive damages in a civil case, violated the right to a trial by jury as guaranteed by § 11.
Giles concedes that the common law did not invest juries with sentencing discretion in capital cases. Indeed, "[b]y the common law, the jury determined merely the guilt or innocence of the prisoner; and, if their verdict was guilty, their duties were at an end. They had nothing whatever to say as to the punishment to be inflicted." Fields v. State, 47 Ala. 603, 606 (1872). "The court alone determined what the punishment should be, its extent and its severity; with that the jury had nothing to do. Their whole duty was discharged when the verdict of guilty was pronounced." Id.
On this ground, the Court of Criminal Appeals has held that Ala.Code 1975, § 13A-5-46, which designates merely as "advisory" the jury's verdict in capital cases, does not violate § 11. Crowe v. State, 485 So.2d 351, 363 (Ala.Crim.App.1984), reversed on other grounds, Ex parte Crowe, 485 So.2d 373 (Ala. 1985) (citing George v. People, 167 Ill. 447, 47 N.E. 741 (1897)); State v. Reynolds, 608 S.W.2d 422 (Mo.1980); State v. Hamey, 168 Mo. 167, 67 S.W. 620 (1902); Woods v. State, 130 Tenn. 100, 169 S.W. 558 (1914); Ex parte Moser, 602 S.W.2d 530 (Tex.Crim.App.1980); 1 Bishop's New Criminal Procedure § 43, at 20 (1913); and 4 W. Blackstone, Blackstone's Commentaries 354-55, 366-69 (reprint 1979). The Crowe court stated:
"We must agree with the above authorities and hold that Article I, Section 11, confers the right of trial by jury as [it] existed at common law and the time of Alabama's first state constitution. This provision did not incorporate the statutes conferring sentencing authority upon the jury which were in force at the time of the adoption of the 1901 Alabama Constitution."
Crowe, 485 So.2d at 364 (emphasis added); see also Frazier v. State, 562 So.2d 543, 550 (Ala.Crim.App.1989), reversed on other grounds, Ex parte Frazier, 562 So.2d 560 (Ala.1990).
Giles, however, observes that in 1901, when the present constitution was adopted, Alabama juries were authorized by statute to sentence defendants to death or life imprisonment at the jury's option. Ala.Code 1907, § 7088; Ala.Code 1896, § 4858. He cites Gilbreath v. Wallace, 292 Ala. 267, 269, 292 So.2d 651, 652 (1974), for the proposition that § 11 "effected a `freezing' of the right to jury trial as of 1901." (Emphasis added.) He contends, in effect, that § 11 "freezes" the sentencing procedure that existed in 1901. Thus, he insists, the judicial override exercised in this case violated his right to trial by jury.
In our view, Giles reads too much into Gilbreath. To be sure, that case did hold that § 11 preserved inviolate the right, which existed by statute in 1901, to a trial by jury in an action to contest the validity of a will. 292 Ala. at 273, 292 So.2d at 656. However, it reached this conclusion only after an extensive analysis of the history of the claimed right. Indeed, the Court expressly noted *581 certain "exceptions to the general rule" in which the legislature was permitted to alter the character of the fact-finding tribunal, despite the fact that in each case a trial by jury was provided by statute in 1901. 292 Ala. at 270 n. 2, 292 So.2d at 653 n. 2. The Court referred specifically to procedures involving disbarment, id. (citing Ex parte Thompson, 228 Ala. 113, 152 So. 229 (1933)) and those involving insanity inquisitions, id. (citing Smith v. Smith, 254 Ala. 404, 48 So.2d 546 (1950)). Significantly, the holdings in both Thompson and Smith turned on conclusions drawn from the history of the claimed right. Thus, a historical review, although it is not always dispositive, is the starting point in any § 11 analysis.
Recalling the common-law practice to which we have already adverted in this opinion, we further note that mandatory capital punishment for designated offenses was the rule at the inception of this nation. Introduction, Mandatory Capital Punishment?, 54 B.U.L.Rev. 30, 30 n. 1 (1974). Thus, the first "Act for the Punishment of Crimes and Misdemeanors" passed in 1802 by the Legislative Council and House of Representatives of the Mississippi Territory provided: "That if any person or persons shall commit the crime of wilful murder, such person or persons, on being thereof convicted, shall suffer death." H. Toulmin, A Digest of the Laws of the State of Alabama, Tit. 17, Chapt. 1, § 1 (1823) (emphasis added).
In 1841, the Alabama legislature, for the first time, provided the jury an option of returning a sentence of death or life imprisonment as punishment for first-degree murder. Chapter 3, § 1, of the Penal Code provided: "[A]nd every person guilty of murder in the first degree, shall on conviction suffer death or confinement in the penitentiary for life at the discretion of the jury trying the same." Aikin's Digest of the Laws of the State of Alabama p. 210 (Supp.1841). This act paralleled legislation in a number of states in the early nineteenth century. This legislative initiative apparently resulted from a number of concernsnot the least of which was that a mandatory death penalty often thwarted convictions of patently guilty offenders. This concern was succinctly stated as follows:
"The death penalty, many observers claimed, made securing convictions more difficult and often resulted in the acquittal of obviously guilty defendants.
"This argument found frequent expression in antebellum newspapers and magazines. The Providence, Rhode Island, Journal of January 9, 1838, complained that juries had been acquitting criminals given any excuse to do so. `Unless the prisoner,' the editor said, `from his color or extraction, is cut off from ordinary sympathy, he is almost sure of an acquittal.' A writer in a New York journal, in 1847, agreed. `The law of blood is virtually inoperative,' he said. Unpunished criminals were walking the streets because juries would not convict them of capital crimes. `When a human life is at stake,' he wrote, `it is evident that the minds of jurors become distempered and unsettled, and they rush to any conclusion, however irrational and absurd, rather than pronounce the doom of a fellow-being.'"
P. Mackey, The Inutility of Mandatory Capital Punishment: An Historical Note, 54 B.U.L.Rev. 32, 32-34 (1974).
The life imprisonment option remained a feature of Alabama's capital murder statutes throughout successive codifications, until 1975. Ala.Code 1940 (and as recompiled 1958), Tit. 14, § 318; Ala.Code 1923, § 4458; Ala.Code 1907, § 7088; Ala.Code 1896, § 4858; Ala.Code 1887, § 3729; Ala.Code 1876, § 4296; Ala.Code 1867, § 3654; Ala. Code 1852, § 112. However, Alabama's statute and comparable statutes in other states were "eradicated in the wake of Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)." Beck v. State, 396 So.2d 645, 649 (Ala.1980).
In Furman, the United States Supreme Court, as it explained in Gregg v. Georgia, 428 U.S. 153, 188, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), declared that the death penalty could not, consistently with the Eighth and Fourteenth Amendments to the United States Constitution, "be imposed under sentencing procedures that created a substantial risk that it would be inflicted in *582 an arbitrary and capricious manner." (Emphasis added). Following Furman, several legislatures, including Alabama's, attempted to eliminate from their statutory schemes any elements that might lead to arbitrary or capricious results, by removing the jury's option to impose a sentence of life imprisonment. Beck v. Alabama, 447 U.S. 625, 639, 100 S.Ct. 2382, 2390-91, 65 L.Ed.2d 392, on remand, 396 So.2d 645, 649 (Ala.1980). Those post-Furman statutes thus approximated the mandatory schemes that existed before the "reforms" of the early nineteenth century.
Post-Furman mandatory schemes, however, proved susceptible to the same infirmity discovered in Furman. The United States Supreme Court soon held that statutes mandating the death penalty upon conviction did not, necessarily, eliminate the danger of arbitrary and capricious imposition of the penalty. Baldwin v. Alabama, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985); Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Roberts v. Louisiana, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976). Therefore, when that Court in Beck v. Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), invalidated one aspect[2] of § 13-11-2, Alabama's first response to Furman, this Court, on remand, construed § 13-11-2 as permitting, rather than requiring the imposition of death, in order to conform our law to the concerns addressed in Woodson, Roberts, and Baldwin, supra. Beck v. State, 396 So.2d at 660. Obviously, this result essentially revived the optionality aspect of capital sentencing, and, consequently, the danger of irrationality addressed in Furman.
Six years later, in a holding that supplemented Beck, we significantly limited this danger. In Ex parte Hays, 518 So.2d 768 (Ala.1986), we recognized the authority of the trial judge to override the jury's choice of life imprisonment. We reasoned that the jury's refusal in some cases to choose the death penalty option because of the defendant's race or background could constitute precisely the type of irrationality that the state and federal constitutions aim to prevent. Specifically, we stated:
"Additionally, the allowance of the trial judge's override insures that the death penalty is not imposed in a wanton or freakish manner.
". . . .
"Although in Beck, our analysis focused upon cases of rape that involved black defendants and white victims, the statistics set forth in footnote three of the Beck opinion reveal another disturbing result. Of the 23 death penalty cases analyzed, not a single one involved a white defendant and a black victim. This result, if attributable to the racial bias of juries directed to the black victim of a crime committed by a white, is as freakish, arbitrary, wanton, or capricious as that obtained when such racial bias is directed to the black defendant.... We cannot imagine a case in which the death penalty is more justified than the instant one. The jury's recommendation of life imprisonment in this case is unquestionably a bizarre result. However, it was a result that was remedied by the action of the trial court; an action that in our opinion insured that the death penalty was not imposed in a wanton or freakish manner."
Hays, 518 So.2d at 776-77 (emphasis added). We concluded that the judicial override provided the justice system another opportunity to achieve rational results in capital cases.
Based on the foregoing analysis of the history of the procedure challenged in this case, we conclude that § 11 does not preclude judicial override of the jury's sentencing recommendation in a capital case. Not only was the jury's optionto sentence to death or to sentence to life imprisonment nonexistent at common law, the procedures now employed in capital cases are mandated, to a large degree, by federal death penalty doctrine. In this respect, capital sentencing procedure contrasts sharply with punitive damages assessments. See TXO Production Corp. v. Alliance Resources Corp., ___ U.S. *583 ___, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993); Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Given the supremacy of federal law over state constitutional provisions, and the notoriously ambulatory nature of federal death penalty doctrine,[3] we cannot hold, as Giles urges us to do, that the statutory procedure in effect in 1901 is "frozen" by § 11.
Moreover, the operation and effect of the judicial override of the jury's option under §§ 13-11-3 and -4, as construed in Beck, differs considerably from the operation and effect of the damages limitation in § 6-11-21, the statute we held invalid in Henderson. The two factors we considered most relevant in Henderson were (1) the broad discretion to assess punitive damages traditionally possessed by juries and (2) the absolute nature of the limitation imposed by § 6-11-21.
Juries traditionally enjoyed the broadest discretion in the imposition of punitive and noncompensatory civil damages. Following the jury's exercise of such discretion, the award could not be set aside or reduced unless it was "flawed by bias, passion, prejudice, corruption, or other improper motive" and was therefore beyond the scope of constitutional protection. Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 171 (Ala.1991); see also City Bank of Alabama v. Eskridge, 521 So.2d 931, 932 (Ala.1988); Hammond v. City of Gadsden, 493 So.2d 1374, 1378 (Ala. 1986). By contrast, Ala.Code 1896, § 4858, which was in effect in 1901, restricted the jury to the narrowest possible choice in imposing a sentencethat is, between one of only two options. The "discretion" authorized under § 4858, therefore, never approached the quantity or quality of discretion afforded juries in the imposition of civil damages.
Also, the statute we held invalid in Henderson, unlike the judicial override challenged here, inhibited the civil jury in the broadest exercise of its discretion by capping its award in each case, regardless of the particular facts of the case. The judicial override procedure challenged by Giles represents, by definition, the antithesis of the procedure invalidated in Henderson. This procedure, which impacts the capital jury in the narrowest possible exercise of its function, is fact specific, that is, it allows the trial judge to override the jury's option only upon specific findings peculiar to each case. This procedure, based on such a case-by-case review of the jury's option, represents the antithesis of the procedure we held invalid in Henderson.
We also find Giles's argument unpersuasive for another reason. If, as he contends, the jury's choice of sentence is sacrosanct, then an override of its choice of death would appear to violate § 11 as clearly as would an override of its choice of life imprisonment. Such a holding would, if implemented, necessarily overrule Beck, and would appear to place §§ 13-11-1 to -9, once again, in conflict with the Eighth Amendment as that amendment is currently understood.
Consequently, we hold that § 11 does not preclude the judge's override of the jury's recommendation of life imprisonment in a capital case, and we reaffirm the principle that, in Alabama, the "judge, and not the jury, is the final sentencing authority in criminal proceedings." Ex parte Hays, 518 So.2d 768, 774 (Ala.1986); Beck v. State, 396 So.2d at 659; Jacobs v. State, 361 So.2d 640, 644 (Ala.1978), cert. denied, 439 U.S. 1122, 99 S.Ct. 1034, 59 L.Ed.2d 83 (1979).
Giles also argues for reversal on the ground that the trial judge, in his sentencing order, recited Ala.Code 1975, § 13A-5-49, which applies only to acts committed after June 30, 1981, as the source of the aggravating circumstances on which he relied to support a sentence of death. We are unpersuaded by this contention.
The trial judge cited the circumstances contained in § 13A-5-49(3) ("The defendant knowingly created a great risk of death to many persons"); § 13A-5-49(4) ("The capital *584 offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary, or kidnapping"); and § 13A-5-49(8) ("The capital offense was especially heinous, atrocious or cruel compared to other capital offenses"). In comparing these circumstances with those contained in § 13-11-6(3) ("The defendant knowingly created a great risk of death to many persons"); § 13-11-6(4) ("The capital felony was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping for ransom"); and § 13-11-6(8) ("The capital felony was especially heinous, atrocious or cruel"), we are unable to discern any substantive difference in the provisions. Consequently, we can discern no sense in which Giles was prejudiced by the trial court's technical error.
Giles further contends that the trial court erred in finding that "[t]he defendant knowingly created a great risk of death to many persons," § 13A-5-49(3), § 13-11-6(3)a finding based on the injuries intentionally inflicted on the surviving Nelson family members. Giles insists that this finding was unauthorized, because, he argues, "this aggravating circumstance is intended to reach only the type of situations where a capital defendant creates a great risk of death to persons other than the intended victim." Brief in Support of Petition for Writ of Certiorari, at 44 (emphasis added).
We disagree. It would be anomalous to hold that § 13-11-6(3) allows sentence enhancement where the defendant unintentionally endangers persons other than the homicide victims, but disallows enhancement where the defendant intentionally threatens the lives of others. We decline to create such an anomaly.
In this connection, Giles contends that he was convicted on one count of assault arising out of the attacks on the surviving family members, and, therefore, that the enhancement of his sentence on the basis of those assaults constitutes a violation of his rights against "double jeopardy." We disagree with this contention.
The Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). The guarantee "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." Missouri v. Hunter, 459 U.S. 359, 366, 103 S.Ct. 673, 678, 74 L.Ed.2d 535 (1983).
None of these protections encompasses the circumstances of which Giles complains. Indeed, to accept Giles's argument would force the state to forgo prosecutions for multiple crimes committed in conjunction with murder solely to preserve them for consideration in the sentencing phase of a successful murder prosecution. This result was clearly not the intent of the legislature, which, in at least three statutory provisions, has expressly made other criminal acts relevant considerations for the purposes of sentence enhancement: § 13-11-6(1) ("The capital felony was committed by a person under sentence of imprisonment"); § 13-11-6(2) ("The defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person"); § 13-11-6(4) ("The capital felony was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping for ransom"). Nor is such a result the purpose of the constitutional provisions prohibiting double jeopardy. Consequently, the trial court's consideration of the aggravating circumstance identical to the one set forth in § 13-11-6(3) did not violate Giles's double-jeopardy guarantees.
Giles argues for reversal on the ground that the trial judge failed to catalog specifically in his sentencing order the nonstatutory mitigating factors he found and considered in reaching his decision to override the jury's *585 recommendation. Similarly, Giles contends that the trial court failed to find the existence of facts, which, he insists, were uncontroverted and supported his arguments in favor of mitigation of the sentence. Specifically, Giles offered evidence that he had (1) adjusted well to prison life; (2) experienced a religious conversion since the crime; (3) had an exemplary childhood; (4) experienced remorse; and (5) cooperated with authorities. He also urged the judge and the jury to consider as a mitigating factor the length of time that had elapsed between the act and the sentencing. The upshot of his arguments, as we understand them, is that this evidence, as a matter of law, counterbalances the aggravating factors and requires mitigation of the sentence.
We disagree with Giles's factual and legal conclusions. In his sentencing order, the trial judge stated:
"After consideration of the evidence presented at the jury phase of the sentence hearing, the presentence investigation report and after hearing and considering the arguments both for aggravating circumstances and mitigating circumstances in this case, the court makes the following findings concerning those circumstances:
". . . .
"H. In addition to the mitigating circumstance[s] listed under [§] 13A-5-51 the defendant has argued as [a] mitigating circumstance the fact that a long time has elapsed since the commission of the capital offense.... And the court does find that a long time has elapsed ..., but does not find that it is a mitigating circumstance or that it is entitled to any weight.

"I. As far as the remorse of the defendant is concerned, this has not necessarily been prov[en] to the court's satisfaction although there was at least one witness who testified to the change in attitude of the defendant. The court does not find that this has been sufficiently established.
"J. As to cooperation of the defendant with the authorities after the crime by giving a statement, it might be and is noted by the court that at the time the statement was given the defendant already realized that four of the victims of the crime had survived and were able to identify him.

"Having considered all of the statutory aggravating circumstances and the statutory mitigating circumstances and the additional mitigating circumstances and evidence offered by the defendant, the court now finds and is convinced beyond a reasonable doubt that the aggravating circumstances as heretofore stated and brought before this court outweigh any mitigating circumstances as presented by the evidence."
(Emphasis added.)
Reading the trial judge's order in its entirety, we are compelled to conclude that he found the existence of all but one of these factorsGiles's claimed remorseand weighed each of them in his deliberations. We are aware of no authority for Giles's legal proposition that these factors, assuming they were conclusively established, mandate a sentence of life imprisonment. Although evidence of nonstatutory factors, such as that presented by Giles, cannot be excluded from the sentencing tribunal, Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), such evidence is only "potentially mitigating." Skipper v. South Carolina, 476 U.S. 1, 7, 106 S.Ct. 1669, 1672, 90 L.Ed.2d 1 (1986) (emphasis added). The sentencing tribunal, and, on appeal, the reviewing court, determines the weight to be assigned to each factor. Ex parte Hart, 612 So.2d 536 (Ala. 1992), cert. denied, Hart v. Alabama, ___ U.S. ___, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993); Smith v. State, 407 So.2d 894 (Fla. 1981), cert. denied, 456 U.S. 984, 102 S.Ct. 2260, 72 L.Ed.2d 864 (1982).
Having independently weighed the aggravating and mitigating factors, we agree with the trial court that the aggravating factors considerably outweigh the mitigating factors. Thus, we find no reason for reversal on this ground.
Giles advances a number of arguments relating specifically to the jury. For example, he challenges the jury's composition and challenges various instructions given the jury. He also challenges a number of remarks made by the state in its closing jury *586 arguments. However, the jury did not recommend death. Indeed, Giles was ultimately sentenced, not by the jury, but by the court. Because we cannot discern how Giles could have been prejudiced by errors relating to the jury, we must reject his arguments for reversal on these grounds.
Giles also challenges a number of aspects of the guilt phase of his trial, which occurred in December 1982. This Court, however, thoroughly considered all aspects of that phase of the trial on certiorari review following Giles's appeal of his 1982 conviction and sentence. Ex parte Giles, 554 So.2d 1089 (Ala.1987). Therefore, we will not revisit those aspects here.
We have reviewed and considered all aspects of the proceedings before us and find no reason to reverse the judgment of the Court of Criminal Appeals. Consequently, that judgment is affirmed.
AFFIRMED.
ALMON, SHORES and INGRAM, JJ., concur.
MADDOX, J., concurs specially.
HOUSTON and STEAGALL, JJ., concur in the result.
MADDOX, Justice (concurring specially).
I write specially only to address the Court's discussion of Giles's claim that the judicial override statute violates his right to jury trial, as guaranteed by § 11 of the Constitution of Alabama 1901.
In addressing Giles's claim that he had the right to have the jury fix his punishment because, he argues, juries fixed the punishment in capital cases when the 1901 Constitution was adopted, the Court attempts to distinguish Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), a case in which a majority of this Court held that the legislature could not limit to $250,000 jury awards of punitive damages. I filed a lengthy special opinion in that case, in which I expressed why I thought that this Court was incorrect in its interpretation of the scope of legislative power. The Court's attempt in its opinion in this case to justify its holding in Henderson, I believe, demonstrates the incorrectness of the legal reasoning in Henderson.
In Henderson, I was of the firm opinion that the legislature could establish a cap on punitive damages that would override a jury determination to the contrary. My views of legislative power are the same today as they were then, and those views are adequately expressed in my special opinion in Henderson, and in my special writings in other cases decided by this Court involving the scope of legislative power. See Moore v. Mobile Infirmary Ass'n, 592 So.2d 156, 178-83 (Ala.1991) (Maddox, J., dissenting); Clark v. Container Corp. of America, 589 So.2d 184, 201-02 (Ala.1991) (Maddox, J., dissenting); Armstrong v. Roger's Outdoor Sports, Inc., 581 So.2d 414, 423-27 (Ala.1991) (Maddox, J., dissenting). See also Industrial Chemical & Fiberglass Corp. v. Chandler, 547 So.2d 812, 824-29, 833-34 (Ala.1988) (Maddox, J., concurring in part; dissenting in part); Fireman's Fund American Insurance Co. v. Coleman, 394 So.2d 334, 355-58 (Ala.1980) (Beatty, J., dissenting, joined by Maddox, J.); Grantham v. Denke, 359 So.2d 785, 789-92 (Ala.1978) (Maddox, J., dissenting); Bagby Elevator & Electric Co. v. McBride, 292 Ala. 191, 200-08, 291 So.2d 306 (1974) (Maddox, J., dissenting).
I need not restate the legal principles I set out most recently in Henderson, but the views I expressed in that case are consistent with the holding in this case that the legislature has the power to change the method of sentencing in criminal cases from the method that existed at the time of the adoption of the 1901 Constitution.
The majority attempts to distinguish the legal principles applicable in this case from those that were involved in Henderson. Both cases involve the legislative power to override a jury verdict. I personally can see no distinction between the legislature's power to override the jury's verdict in a criminal case and the legislature's power to override the jury's verdict in a civil case. If a distinction is to be made, it would seem to me that the legislature's power would be more restricted in a case involving a jury verdict concerning the death penalty than in a case involving only civil damages.
*587 My special concurrence is based upon the proposition that the Legislature of Alabama is empowered to change the method of sentencing in capital cases and to take from the jury the right to determine the sentence and to make the trial judge the sentencing authority in a capital case.
The legislature has taken from juries all power to impose sentences in criminal cases primarily because juries were awarding such disparate sentences. State and federal governments during the last two or three decades have taken steps to ensure parity in sentencing criminal defendants, and those steps include placing sentencing in the hands of judges rather than juries.
I do not believe that § 11 of the Alabama Constitution in any manner restricts that legislative power; therefore, I concur specially in the main opinion.
HOUSTON, Justice (concurring in the result).
Caps on punitive damages assessed by juries are as dead as Jacob Marley[4]; and I do not intend for the encumbered specter of Marley (in the form of caps on punitive damages) to visit this Court. This special writing is not about punitive damages. This special writing addresses only the grander issue of the constitutional right to have a jury resolve issues of life or death arising as a result of the majority opinion in Henderson v. Alabama Power Co., 627 So.2d 878 (Ala.1993), and in light of the penultimate section of the Declaration of Rights in the Constitution of Alabama of 1901 ("Sec. 35. That the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government assumes other functions it is usurpation and oppression.") (Emphasis added.)
Although I dissented in Henderson v. Alabama Power Co., and I still think that the majority opinion is wrong in reference to the scope of § 104 of the Constitution and in relation to the interaction of § 11 with § 104 and other constitutional provisions, if the majority opinion had reversed Giles's sentence to death on the basis that Ala.Code 1975, § 13A-5-45 through § 13A-5-47 violated § 11 of the Constitution, I could not have ignored the precedent of Henderson and Gilbreath v. Wallace, 292 Ala. 267, 292 So.2d 651 (1974), and would have had to at least concur in the result in reversing Giles's sentence to death.
However, because the majority opinion upholds Giles's sentence to death, I am freed from precedent, and I can adhere to the clear words of the Constitution and to the intent of the drafters of the Constitution. The clear words of the Constitution provide that the legislature can pass general laws fixing the punishment for crime. § 104(14), Ala. Const. 1901. The drafters of the Constitution intended for the words to mean what they clearly express. Official Proceedings of the Constitutional Convention of 1901, pp. 1799-1800. Ala.Code 1975, § 13A-5-44 through § 13A-5-47 are general laws and relate to fixing punishment for crime. Therefore, they are constitutional. To me, the case is closed.
Unfortunately, because of the interpretation of § 104 of the Constitution and the relation of § 11 to other constitutional provisions in the majority opinion in Henderson, to uphold Giles's sentence to death the majority opinion in this case ignores or misconstrues the following cases in an attempt to distinguish the law of Alabama for 138 years prior to the Henderson decision: Tims v. State, 26 Ala. 165 (1855); Alford v. State ex rel. Attorney General, 170 Ala. 178, 54 So. 213 (1910); In re: One Chevrolet Automobile, 205 Ala. 337, 87 So. 592 (1921); Miller v. Gaston, 212 Ala. 519, 103 So. 541 (1925); *588 Gilbreath v. Wallace, 292 Ala. 267, 270, 292 So.2d 651, 653 (1974).
The majority opinion states that "Giles reads too much into Gilbreath [v. Wallace]."
In Gilbreath, this Court wrote:
"In Alford v. State [ex rel. Attorney General, 170 Ala. 178, 54 So. 213 (1910)], the court quoted from Tims v. State, [26 Ala. 165 (1855)], and set forth the principle as it applies to both civil and criminal cases:
"`The right [trial by jury] is confined to those classes of cases in which the right existed at common law, or in which it was used at the time of the adoption of the Constitution. Where there have been several Constitutions, the right is in reference to its existence at the time of the adoption of the last one.'
"Accordingly, the question here posed may be restated as follows: Did the right of trial by jury in a will contest case exist in Alabama as a matter of right at the time of the adoption of our first constitution in 1819, or (to come within the latter portion of the above principle) did such right exist by way of statute at the time of adoption of the 1901 Constitution?"
292 Ala. at 270, 292 So.2d at 653 (footnote omitted).
How the majority opinion can state that Giles reads too much into Gilbreath eludes me. I cannot follow the majority's legal reasoning; however, for the reasons previously stated, I think the majority reaches the right result, based upon the plain meaning of the Constitution, which was ignored in the majority opinion in Henderson.
The majority cites two Court of Criminal Appeals opinions that were reversed by this Court on other grounds as support for the conclusion that § 13A-5-45 through § 13A-5-47 do not violate § 11 of the Constitution. I wrote for this Court in reversing Ex parte Frazier, 562 So.2d 560 (Ala.1990), one of the cases cited in the majority opinion, and I did not even reach the issue of whether § 13A-5-45 through § 13A-5-47 violated § 11 of the Constitution. I would have held that they did not, because when I authored the opinion for the Court in Frazier § 104(14) of the Constitution had not been nullified, as it was later by the majority opinion in Henderson.
As I understand the majority opinion in this case, the right to trial by jury remains inviolate by virtue of § 11 of the Constitution of Alabama of 1901 in all cases in which trial by jury was authorized by statutory and case law of England and the American colonies before the American Revolution (i.e., by the common law). However, the right to trial by jury created by statutory law of a duly elected legislature enacted before 1901 but after the American Revolution is not inviolate but can be eliminated or modified by legislative act; this is contrary to the holding in Gilbreath v. Wallace, etc. The inviolate right to trial by jury attaches to causes of action created by this Court that did not even exist prior to the American Revolution or in 1901 when the Constitution was ratified (like the claim of Henderson in Henderson v. Alabama Power Co.), and it attaches at the moment of judicial creation.
The majority of this Court in Henderson asserted:
"In our considered opinion and judgment, the constitutional protection of the right to jury trial imposed by § 11, and the consequent limitation on legislative power, are much broader, deeper, and more important than Justice Houston would have them be."
627 So.2d at 893.
From reading the majority opinion in this case and comparing it to the majority opinion in Henderson, it appears to me that the constitutional protection of the right to jury trial imposed by § 11 and the consequent *589 limitation on legislative and judicial power imposed by § 11 are not as broad, deep, or important to a majority of this Court, when it is dealing with issues of life or liberty, which every citizen has a constitutional right to demand that government protect his "enjoyment of" (§ 35, Constitution), as they are when it is dealing with liability and lucre, or even when it is dealing with punitive damages, to which no one has a right.

On Application for Rehearing
PER CURIAM.
APPLICATION FOR REHEARING OVERRULED.
MADDOX, SHORES, HOUSTON, STEAGALL and INGRAM, JJ., concur.
ALMON, J., dissents.
ALMON, Justice (dissenting).
On original submission, I considered the issue addressed at length in the main opinion to the exclusion of the issue most urged by the petitioner: the retroactivity of Ex parte Hays, 518 So.2d 768 (Ala.1986). On application for rehearing, the petitioner reiterates his arguments on the retroactivity issue, and I now dissent on that basis. I continue to concur with the views expressed in the main opinion on the constitutionality of a judicial override as against a challenge based on the right to jury trial.
I dissented in Hays from the decision to read into former §§ 13A-5-30 through38 a judicial override of a jury's verdict of life without parole. There was no statutory provision for such a death sentence in cases involving conduct occurring before July 1, 1981. The murders of which Giles has been convicted occurred on November 10, 1978. Even aside from my dissent in Hays, Giles strongly argues that the rule of Hays should not be given retroactive operation in cases other than Hays's.
Giles points to the following statement in Teague v. Lane, 489 U.S. 288, 299, 109 S.Ct. 1060, 1069, 103 L.Ed.2d 334 (1989): "In the past, the Court has, without discussion, often applied a new constitutional rule of criminal procedure to the defendant in the case announcing the new rule, and has confronted the question of retroactivity later when a different defendant sought the benefit of that rule." He says that this is the case in which to decide the retroactivity of the Hays rule. I agree, and I do not think Hays should be applied retroactively.
In Ex parte Coker, 575 So.2d 43, 52 (Ala. 1990), the Court quoted the following "test for retroactive application in criminal cases":
"`In deciding whether to apply newly adopted constitutional rulings retroactively, we have considered three criteria: (1) the purpose of the new rule; (2) the extent of reliance upon the old rule; and (3) the effect retroactive application would have on the administration of justice.'"
Id., quoting Halliday v. United States, 394 U.S. 831, 832, 89 S.Ct. 1498, 1499, 23 L.Ed.2d 16 (1969). The only "purpose" I could discern in the Hays rule was a kind of racial balancing, imposing a death sentence on Hays because of the racial motivation of his crime. I see no furtherance of that purpose by imposing a death sentence on Giles. Giles's attorneys insist that they relied on the old rule at trial, for example by trying the sentencing proceedings under the assumption that a hung jury would mean an automatic sentence of life without parole. I do not imagine retroactive application would have much effect on the administration of justicemost convictions must have become final under the old death penalty law, and surely the State will not now try to obtain death sentences for those now under life sentences under the old law. This minimal effect on the administration of justice is not an argument for retroactive application, however.
In short, I can see no principled reason for retroactively applying of the Hays rule. As I stated in my dissent in Hays, § 7 of the Alabama Constitution of 1901, provides: "[N]o person shall be punished but by virtue of a law established and promulgated prior to the offense and legally applied." A death sentence for Arthur Lee Giles after a jury verdict of life without parole violates that provision.
*590 I dissent from the denial of the application for rehearing.
NOTES
[1] The only factual dispute concerned the identity of the man who stabbed each family member. Jones stated, and Giles denied, that Giles stabbed some of the members. Brenda, however, testified unequivocally that Giles was the man who stabbed her and Wilene.
[2] The specific section invalidated by the United States Supreme Court was the provision in § 13-11-2(a) that prohibited the jury's consideration of lesser included offenses. 447 U.S. at 627, 100 S.Ct. at 2384.
[3] In commenting upon the unpredictability of recent federal death penalty doctrine, Justice Rehnquist stated: "[T]he Court has gone from pillar to post, with the result that the sort of reasonable predictability upon which legislatures, trial courts, and appellate courts must of necessity rely has been all but completely sacrificed." Lockett v. Ohio, 438 U.S. 621, 629, 98 S.Ct. 2981, 2973, 57 L.Ed.2d 1000 (1978) (Rehnquist, J., dissenting).
[4] "MARLEY WAS DEAD: to begin with. There is no doubt whatever about that. The register of his burial was signed by the clergyman, the clerk, the undertaker, and the chief mourner. Scrooge signed it; and Scrooge's name was good upon `Change, for anything he chose to put his hand to. Old Marley was as dead as a door-nail.'"

Charles Dickens, A Christmas Carol (Stewart, Tabori & Chang, New York 1990) page 7.