BRYAN, Justice.
Alabama State University (“ASU”), along with individual members of the ASU Board of Trustees; John F. Knight, former executive vice president, and former chief operating officer of ASU; William H. Harris, former interim president of ASU; and Gwendolyn Boyd, president of ASU (all individual defendants are hereinafter collectively referred to as “the ASU officials”), appeal from a judgment entered against them by the Montgomery Circuit Court (“the trial court”). In that judgment, the trial court awarded Stacy Dan-ley, former athletic director of ASU, separate awards of $118,096.87 and $22,120 and also ruled in Danle/s favor on ASU’s counterclaim against Danley for recoupment. Danley cross-appeals from the judgment, arguing that the trial court erred by failing to order ASU to reinstate him to his former position as athletic director and by failing to award him attorney fees.

Facts and Procedural History

In 2010, ASU and Danley entered into a contract pursuant to which Danley would serve as athletic director of ASU from July 26, 2010, through September 30, 2013, at an annual salary of $125,000. In conjunction with his employment, Danley received a university-issued purchasing card to be used for expenses incurred while performing his responsibilities as athletic director. Upon receipt of the purchasing card, Dan-ley signed a “purchasing-eard-acknowledgment form,” which includes the following *118 statement: “I understand that any unal-lowable charges will be refunded through payroll deduction.”
On August 28, 2012, on the recommendation of Knight, then the executive vice president and chief operating officer of ASU, Danley was placed on administrative leave with pay. On October 15, 2012, Knight informed Danley in writing that Danley was being recommended for termination of his employment and listed 10 allegations in support of that recommendation. The notice of allegations also indicated that a pre-termination hearing would be held in front of a hearing officer on October 20, 2012. On Danley’s motion, the pre-termination hearing was continued to November 15, 2012.
The pre-termination hearing occurred over three days between November 15, 2012, and November 18, 2012. On December 6, 2012, the hearing officer issued his findings and recommendations. The hearing officer found Danley “not guilty” on six of the allegations listed in the notice of allegations but found that ASU had met its burden of proof on the remaining four allegations and that those four charges were sufficient in and of themselves to support the termination of Danley’s employment. Thus, the hearing officer recommended that Danley’s employment be terminated effective December 31, 2012. On December 31, 2012, Carmen Douglas, vice president of ASU’s Office of Human Resources, informed Danley in writing that then President Harris concurred with the hearing officer’s findings and that Dan-ley’s employment was being terminated effective immediately.
On January 30, 2013, Danley filed in the trial court a lengthy “petition for writ of certiorari, declaratory judgment, petition for writ of mandamus and injunctive relief’ against ASU; the members of the Board of Trustees, individually and in their official capacities; Harris, individually and in his official capacity as interim president of ASU; and Knight, individually and in his official capacity as executive vice president and chief operating officer of ASU.[1] Dan-ley’s complaint is lengthy and, at times, unduly repetitive. For purposes of resolving these appeals, it is sufficient to note that Danley asserted, in addition to other claims, a claim pursuant to both the Alabama Constitution of 1901 and 42 U.S.C. § 1983 in which he alleged that the manner in which the pre-termination hearing was conducted violated his due-process rights. Among other relief, Danley sought to be restored to his position as athletic director; compensatory damages, including backpay; and attorney fees.
On March 6, 2013, ASU and the ASU officials filed an answer and a motion to dismiss some of Danley’s claims. In their answer, ASU and the ASU officials denied those counts in Danley’s complaint that generally sought injunctive relief and, as to those claims that sought monetary relief, raised defenses of sovereign immunity, State-agent immunity, and qualified immunity. ASU and the ASU officials’ answer also included a counterclaim against Dan-ley for the recoupment of $67,242.61 in allegedly unauthorized and/or undocumented charges made to Danley’s purchasing card. Danley filed a reply to the counterclaim.
On April 21, 2013, Danley filed a response to the motion to dismiss in which he argued that the ASU officials, both in their individual and official capacities, were not entitled to immunity from either Dan-ley’s state-law or federal-law claims for damages. Following a hearing, the trial *119 court, then under the direction of Judge Truman M. Hobbs, entered an order on May 14, 2013, that stated, in pertinent part: “[T]he Court is convinced that sovereign immunity prohibits an award of back pay or money damages against the State or any official thereof.”[2]
On July 28,2013, Danley filed an amended complaint in which he added, among others, claims alleging that ASU and the ASU officials had further violated his due-process rights by failing to provide a post-termination hearing; that, pursuant to § 16-50-23, Ala.Code 1975, only the Board of Trustees had the power to terminate his employment and thus that his employment had not been properly terminated; that ASU and the ASU officials had violated his due-process rights by withdrawing his pay for December 2012 from his bank account; and that ASU and the ASU officials had converted his December 2012 pay. It is undisputed that, shortly before the termination of Danley’s employment on December 31, 2012, Danley’s December 2012 pay, which had been deposited into his bank account via direct deposit, was withdrawn from his bank account at the initiation of the comptroller’s office of ASU so that ASU could deduct money Danley allegedly owed ASU from that payroll deposit. It is also undisputed that Danley’s December 2012 pay was redeposited in full into his bank account in February 2013, approximately two months after it had been withdrawn. Danley requested, in addition to the relief requested in his original complaint, damages for the withdrawal of his December 2012 pay.
On October 21, 2013, ASU and the ASU officials filed a motion for a summary judgment. On May 2, 2014, Chief Justice Roy S. Moore appointed Judge James H. Reid, Jr., to the case after Judge Hobbs and other subsequently appointed judges re-cused themselves. On October 24, 2014, after numerous filings and continuances, Judge Reid entered an order denying ASU and the ASU officials’, motion, for a summary judgment. Judge Reid also entered an order dismissing Danley’s claims against the members of the Board of Trustees in their individual capacities. The trial court held a trial between February 23 and February 27, 2015. Following the trial and the submission of the parties’ posttrial briefs, the trial court on May 16, 2015, entered a judgment stating, in pertinent part:
“Based upon these facts and the evidence presented in this case, the court hereby finds as follows:
“A. That Danley was not properly terminated and that he remained an employee of ASU through the end of his contract on 9/30/13 and that he is entitled to his contracted payment amount of $11,060.66 per month for 9 months for a total of $99,450.00 for which he is granted a judgment against ASU plus interest in the amount of $18,646.87 for a total judgement in favor of Danley and against ASU in the sum of $118,096.87;
“B. That ASU wrongfully caused to be withdrawn from Danley’s bank-account the sum of $11,060.00, less deductibles, in December 2012, and retained that sum for approximately 2 months and that an appropriate remedy for such wrong is payment to Danley of the sum withheld each month for 2 months or $22,120.00 for which sum Danley is granted an additional judgment against ASU;
*120 “C. That the evidence on the counterclaim is conflicting and confusing; however, the burden is on ASU to prove this claim by a preponderance of the evidence, which it has failed to do;
“Therefore, the court finds for Danley on ASU’s counterclaim;
[[Image here]]
“That all claims not specifically granted herein are hereby denied.”
On May 19, 2015, ASU filed a notice of appeal. On June 2, 2015, Danley timely filed a motion to alter, amend, or vacate the May 16, 2015, judgment. In that motion, Danley moved the trial court to amend the May 16, 2015, judgment to reflect, among other things, that the judgment was entered against not only ASU but also against the ASU officials in either, or both, their individual and official capacities and that the judgment was based on Danley’s state-law and federal-law claims. Danley also moved the trial court to amend the judgment to order that he be reinstated to his former position as athletic director and to award him attorney fees.
On July 21, 2015, the trial court entered an amended judgment that stated, in pertinent part:
“The issues presented included [Dan-ley’s] federal and state claims, including [§] 1983, based on: due process violations associated with defendants’ acts and omissions regarding their effort to terminate his employment; waiver and estoppel by defendants based on then- conduct; defendants’ non-compliance with [§] 16-50-23; defendants’ actions being arbitrary and capricious; the hearing officer's findings and legal conclusions not being supported by the evidence or the law; the wrongful conversion of [Danley’s] personal funds by defendants; [and] an additional due process claim based on the wrongful taking of [Danley’s] personal funds; and First Amendment retaliation. In addition, the court was presented with a counterclaim by the defendant [ASU].
“The parties at trial included ... Dan-ley, and the defendants: [ASU]; the Board of Trustee members in their official capacities; ... Knight, in his individual and official capacity; and ... Harris, in his individual capacity; and ... Boyd in her official capacity as president (collectively referred to herein as ‘defendants’).
[[Image here]]
“The court, having considered [Danley’s] motion ... and being of the opinion that such should be granted, hereby enters the following revised and amended findings and order:
[[Image here]]
“6. The defendants did not properly terminate [Danley] in the following respects, any one of which would justify a judgment in his favor: the defendants did not comply with procedural due process; the defendants, under principles of waiver and estoppel, should have provided Danley with a post-termination hearing but did not; the defendants did not comply with ...[§] 16-50-23;
“7. That Danley’s December pay check in the amount of $11,016.67 ... was reversed and removed from Danley’s personal bank account on orders by officers of ASU, initiated by .., Knight, *121 under supervision, direction, and control by the remaining defendants, and was subsequently returned to Danley’s account approximately 2 months later. This action by defendants was a wrongful taking of property without advance notice or any due process procedure as to such taking.”
The amended judgment retained paragraphs A and B, quoted supra, of the original judgment—the paragraphs awarding Danley damages—except that both paragraphs were amended to reflect that the damages were entered against “defendants” instead of “ASU.”
On July 23, 2015, ASU, in response to the amended judgment, filed with this Court a motion seeking to amend its notice of appeal to reflect that the ASU officials were also appealing; this Court granted that motion, and on July 30, 2015, ASU and the ASU officials filed an amended notice of appeal.[3] On August 18, 2015, Danley, seeking reinstatement to his position as athletic director and attorney fees, filed a cross-appeal from the amended judgment.

Standards of Revieio

“ ‘ “[W]here the evidence has been [presented] ore tenus, a presumption of correctness attends the trial court’s conclusion on issues of fact, and this Court will not disturb the trial court’s conclusion unless it is clearly erroneous and against the great weight of the evidence, but will affirm the judgment if, under any reasonable aspect, it is supported by credible evidence.” ’
“Reed v. Board of Trs. for Alabama State Univ., 778 So.2d 791, 795 (Ala. 2000) (quoting Raidt v. Crane, 342 So.2d 358, 360 (Ala.1977)).”
Kennedy v. Boles Invs., Inc., 53 So.3d 60, 68 (Ala.2010).
“ ‘However, the ore tenus standard of review has no application to a trial court’s conclusions of law or its application of law to the facts; a trial court’s ruling on a question of law carries no presumption of correctness on appeal.’ Ex parte J.E., 1 So.3d [1002,] 1008 [ (Ala.2008) ] (citing [Ex parte] Perkins, 646 So.2d [46,] 47 [ (Ala.1994) ]), and Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala.1999). This Court ‘“review[s] the trial court’s conclusions of law and its application of law to the facts under the de novo standard of review.”’ Id. (quoting Washington v. State, 922 So.2d 145, 158 (Ala.Crim.App.2005)).”
Espinoza v. Rudolph, 46 So.3d 403, 412 (Ala.2010).

Case No. 1110907

We first address ASU’s and the ASU officials’ arguments that they are entitled to immunity from the judgment because, if that issue is decided in their favor, the other issues they raise are moot. ASU and the ASU officials in their official capacities argue that they are immune from liability for the claims resulting in the *122 awards of $118,096.87 (“the contract award”) and of $22,120 (“the wrongful-withdrawal award”) by virtue of Art. I, § 14, of the Alabama Constitution of 1901, and the Eleventh Amendment to the Constitution of the United States. Knight and Harris argue that, in their individual capacities, they are immune from the contract award and the wrongful-withdrawal award by virtue of the doctrines of State-agent immunity and qualified immunity. As noted above, the trial court entered the judgment against the following defendants on both Daniels state-law and federal-law claims: ASU; the members of the Board of Trustees, Knight, and Boyd in their official capacities; and Knight and Harris in their individual capacities. Accordingly, we must determine whether ASU; those ASU officials named in their official capacities; and Knight and Harris, in their individual capacities, are entitled to state and federal immunity from both the contract award and the wrongful-withdrawal award.
I. Immunity from Liability Based on State-Law Claims
A. ASU and the ASU Officials Named in Their Official Capacities
“Under Article 1, § 14, Alabama Constitution of 1901, ‘the State and its agencies have absolute immunity from suit in any court.’ Phillips v. Thomas, 555 So.2d 81, 83 (Ala.1989); see also Taylor v. Troy State University, 437 So.2d 472, 474 (Ala.1983). ‘This immunity extends to the state’s institutions of higher learning.’ Taylor, 437 So.2d at 474; see Breazeale v. Board of Trustees of the University of South Alabama, 575 So.2d 1126, 1128 (Ala.Civ.App.1991). ‘State officers and employees, in their official capacities and individually, are also absolutely immune from suit when the action is, in effect, one against the state.’ Phillips v. Thomas, 555 So.2d at 83; see Taylor v. Troy State University, 437 So.2d at 474.”
Williams v. John C. Calhoun Cmty. Coll., 646 So.2d 1, 2 (Ala.1994).
“ ‘The wall of immunity erected by § 14 is nearly impregnable. Sanders Lead Co. v. Levine, 370 F.Supp. 1115, 1117 (M.D.Ala.1973); Taylor v. Troy State Univ., 437 So.2d 472, 474 (Ala. 1983); Hutchinson v. Board of Trustees of Univ. of Alabama, 288 Ala. 20, 24, 256 So.2d 281, 284 (1971). This immunity may not be waived. Larkins v. Department of Mental Health & Mental Retardation, 806 So.2d 358, 363 (Ala.2001) (“The State is immune from suit, and its immunity cannot be waived by the Legislature or by any other State authority.”); Druid City Hosp. Bd. v. Epperson, 378 So.2d 696 (Ala.1979) (same); Opinion of the Justices No. 69, 247 Ala. 195, 23 So.2d 505 (1945) (same); see also Dunn Constr. Co. v. State Bd. of Adjustment, 234 Ala. 372, 175 So. 383 (1937). “This means not only that the state itself may not be sued, but that this cannot be indirectly accomplished by suing its officers or agents in their official capacity, when a result favorable to plaintiff would be directly to affect the financial status of the state treasury.” State Docks Comm’n v. Barnes, 225 Ala. 403, 405, 143 So. 581, 582 (1932) (emphasis added); see also Southall v. Stricos Corp., 275 Ala. 156, 153 So.2d 234 (1963).’
“Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala.2002).”
*123 Alabama Agric. & Mech. Univ. v. Jones, 895 So.2d 867, 872-78 (Ala.2004).
“Section 14 immunity is not absolute; there are actions that are not barred by the general rule of immunity.
“ ‘[C]ertain actions are not barred by § 14. There are six general categories of actions that do not come within the prohibition of § 14: (1) actions brought to compel State officials to perform their legal duties; (2) actions brought to enjoin State officials from enforcing an unconstitutional law; (3) actions to compel State officials to perform ministerial acts; (4) actions brought against State officials under the Declaratory Judgments Act, Ala. Code 1975, § 6-6-220 et seq., seeking construction of a statute and its application in a given situation; (5) valid inverse condemnation actions brought against State officials in their representative capacity; and (6) actions for injunction or damages brought against State officials in their representative capacity and individually where it was alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law. See Drummond Co. v. Alabama Dep’t of Transp., 937 So.2d 56, 58 (Ala.2006) (quoting Ex parte Carter, 395 So.2d 65, 68 (Ala.1980)); Alabama Dep’t of Transp. v. Harbert Int’l, Inc., 990 So.2d 831 (Ala.2008) (holding that the exception for declaratory-judgment actions applies only to actions against State officials). As we confirmed in Harbert, these “exceptions” to sovereign immunity apply only to actions brought against State officials; they do not apply to actions against the State or against State agencies. See Alabama Dep’t of Transp., 990 So.2d at 840-41.’
“Ex parte Alabama Dep’t of Fin., 991 So.2d 1254, 1256-57 (Ala.2008). The sixth ‘exception’ to § 14 immunity was restated in Ex parte Moulton, 116 So.3d 1119, 1141 (Ala.2013), as follows:
“ ‘(6)(a) actions for injunction brought against State officials in their representative capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, Wallace v. Board of Education of Montgomery County, 280 Ala. 635, 197 So.2d 428 (1967), and (b) actions for damages brought against State officials’in their individual capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, subject to the limitation that the action not be, in effect, one against the State. Phillips v. Thomas, 555 So.2d 81, 83 (Ala.1989).’ ”
Ex parte Hampton, 189 So.3d 14, 17-18 (Ala.2015).
“ ‘These actions are sometimes referred to as “exceptions” to § 14; however, in actuality these actions are simply not considered to be actions “‘against' the State’ for § 14 purposes.’ ” Patterson v. Gladwin Corp., 835 So.2d 137, 142 (Ala.2002). This Court has qualified those “exceptions,” noting that “ ‘[a]n action is one against the [Sjtate when a favorable result for the plaintiff would directly affect a contract or property right of the State, or would result in the plaintiffs recovery of money from the [Sjtate.’” Alabama Agric. & Mech. Univ. v. Jones, 895 So.2d 867, 873 (Ala.2004) (quoting Shoals Cmty. Coll. v. Colagross, 674 So.2d 1311, 1314 (Ala.Civ.App.1995)) (emphasis added in Jones).
“Alabama Dep’t of Transp. v. Harbert Int'l Inc., 990 So.2d 831, 840 (Ala. 2008).”
*124 Vandenberg v. Aramark Educ. Servs., Inc., 81 So.3d 326, 332 (Ala.2011).
“ ‘To determine whether an action against a State officer is, in fact, one against the State, this Court considers
“ ‘ “whether ‘a result favorable to the plaintiff would directly affect a contract or property right of the State,’ Mitchell [v. Davis, 598 So.2d 801, 806 (Ala.1992) ], whether the defendant is simply a ‘conduit’ through which the plaintiff seeks recovery of damages from the State, Barnes v. Dale, 530 So.2d 770, 784 (Ala.1988), and whether ‘a judgment against the officer would directly affect the financial status of the State treasury,’ Lyons [v. River Road Constr., Inc.], 858 So.2d [257] at 261 [ (Ala.2003) ].”
“ ‘Haley [v. Barbour County], 885 So.2d [783] at 788 [ (Ala.2004) ]. Additionally, “[i]n determining whether an action against a state officer is barred by § 14, the Court considers the nature of the suit or the relief demanded, not the character of the office of the person against whom the suit is brought.” Ex parte Carter, 395 So.2d 65, 67-68 (Ala. 1980).’ ”
Ex parte Moulton, 116 So.3d 1119, 1130-31 (Ala.2013) (quoting Alabama Dep’t of Transp. v. Harbert Int’l, Inc., 990 So.2d 831, 839-40 (Ala.2008)).
As our caselaw demonstrates, § 14 provides absolute immunity from suit—and thus liability—for monetary damages based on state-law claims, not only for the State but also for State officials acting in their official capacities. Ex parte Trawick, 959 So.2d 51, 55 (Ala.2006) (holding that “ ‘[a] complaint seeking money damages against a State employee in his or her official capacity is considered a complaint against the State, and such a complaint is barred by ... § 14” (quoting Ex parte Butts, 775 So.2d 173, 177 (Ala.2000))). Danley concedes that § 14 provides ASU with absolute immunity from state-law claims for monetary damages. However, despite the aforementioned authority, Danley argues, citing the first, third, and sixth “exceptions” to § 14 immunity, that § 14 does not bar his state-law claims against those ASU officials named in them official capacities.
We agree that § 14 does not bar Danle/s state-law claims for injunc-tive relief against those ASU officials named in their official capacities. See Stark v. Troy Univ., 514 So.2d 46, 50 (Ala.1987) (holding that “if the individual defendants have not acted toward the plaintiff in accordance with the rules and regulations set by the university, their acts are arbitrary and an action seeking to compel them to perform their legal duties will not be barred by the sovereign immunity clause of the Alabama Constitution of 1901; however, the action for compensatory damages cannot be maintained”). However, Daniels state-law claims seeking damages against those ASU officials named in their official capacities are absolutely barred by § 14, See Moulton, 116 So.3d at 1141 (restating the sixth “exception” to § 14 immunity to clarify that actions for damages against State officials may be asserted, if at all, only against State officials in their individual capacities); Trawick, supra. Despite the well established authority regarding § 14 immunity from liability for damages for State officials sued in their official capacities, Danley cites caselaw that, he argues, supports the affirmance of the contract award against those ASU officials sued in their *125 official capacities to the extent that it is based on Danley’s state-law claims.[4]
It is undisputed, and the amended judgment makes it clear, that the contract award is an award of the salary Danley would have received under his employment contract had his employment not been terminated, i.e., backpay. Danley cites Bessemer Board of Education v. Tucker, 999 So.2d 957 (Ala.Civ.App.2008); Ex parte Bessemer Board of Education, 68 So.3d 782 (Ala.2011); State of Alabama Highway Department v. Milton Construction Co., 586 So.2d 872 (Ala.1991); and Marous Brothers Construction, LLC v. Alabama State University, 533 F.Supp.2d 1199 (M.D.Ala.2008), in support of his argument that “[playing a liquidated, certain amount under a contract with the [Sítate is a ministerial act and the carrying out of a legal duty” and that State agencies and State officials “must stand by monetary obligations, despite claims of immunity.” Danley’s brief, at 64. That is, Danley argues that this Court should affirm the contract award against those ASU officials sued in their official capacities under the first and third “exceptions” to § 14 immunity. The cases Danley cites, however, are distinguishable.
In Tucker, the Court of Civil Appeals, relying on this Court’s decision in Sims v. Etowah County Board of Education, 337 So.2d 1310 (Ala.1976), affirmed the Jefferson Circuit Court’s judgment issuing a writ of mandamus directing the Bessemer Board of Education to pay a previously entered judgment awarding Tucker $49,747 in damages on his breach-of-eon-tract claim against the Board. In affirming the judgment issuing the writ, the Court of Civil Appeals noted that, in Sims, this Court held that, pursuant to § 16-8-40, Ala.Code 1975, county boards of education have the rights to sue and to contract and that those rights carry the implied right to be sued ■ on- their contracts. Tucker, 999 So.2d at 961. However, Sims was overruled in Ex parte Hale County Board of Education, 14 So.3d 844 (Ala.2009), a case in which this Court unequivocally declared that county boards of education are local agencies of the State and, thus, are “clothed in constitutional immunity from suit.” Id. at848.[5]
At issue in Ex parte Bessemer Board was § 16-22-13.1, Ala.Code 1975, which provides the method of calculating percentage pay increases for public-education employees - based on their years of experience. 68 So.3d at 786. Jean Minor, a teacher in the Bessemer School System, sued, among others, the members of the Bessemer Board of Education in their official capacities, alleging that her statutory pay increase had been miscalculated. 68 So.3d at 785. Minor sought backpay for the 2000-2001 fiscal year and sought to have her pay calculated correctly for the ensuing years pursuant to the guidelines in § 16-22-13.1. 68 So.3d at 786. The board members, claiming immunity, moved for either a dismissal of the complaint .or a summary judgment. The trial court entered a judgment dismissing all claims against the board members on the basis of sovereign immunity, but after Minor filed a motion to alter or amend the judgment, the trial court vacated its earlier judgment and entered a new judgment in favor of Minor. In doing so, the trial court found that the board members were not entitled *126 to immunity because they had no discretion in paying Minor the correct salary increase provided in § 16-22-13.1. The board members sought a writ of mandamus from this Court directing the trial court to dismiss Minor’s claims against them on the basis of immunity.[6] 68 So.3d at 788.
In denying the petition, this Court noted that Minor was entitled to bring an action to compel the board members to perform a legal duty or ministerial act and that Minor’s salary increase involved “obedience to the statute; it does not involve any discretion.” 68 So.3d at 790, The issue in Ex parte Bessemer Board was not whether Minor was entitled to a salary increase; rather, the issue was simply whether the salary increase had been calculated correctly. Thus, Minor’s action seeking the pay increase to which she was statutorily entitled was not an action seeking damages from the State but, rather, was an action to compel the performance of a ministerial act.
Those facts distinguish Ex parte Bessemer Board from this case. Minor sought payment of salary she had already earned, but had not received because of an error in calculation, and sought to have her future salary calculated correctly; her action essentially was nothing more than a plea to the trial court to order the board to perform correct mathematical computations. Danley, on the other hand, seeks that portion of his salary he had yet to earn but that, he says, he was entitled to receive because of ASU’s allegedly wrongful termination of his employment. Dan-ley attempts to expand this Court’s holding in Ex parte Bessemer Board to state that paying a judgment that awards a State employee that portion of his or her salary from the date of termination of employment through the end date of the employee’s contract after a trial court finds that the employee’s employment has been wrongfully terminated is merely a ministerial act. That, however, is an inaccurate interpretation of this Court’s holding in Ex parte Bessemer Board. Furthermore, to expand Ex parte Bessemer Board in the manner Danley suggests would puncture the nearly “impregnable barrier,” Jones, supra, of sovereign immunity and would allow for the very recovery that § 14 prohibits—the recovery of monetary damages against the State.
In Milton Construction, the plaintiff contracted with the State Highway Department to perform work on two interstate highways. 586 So.2d at 875. It was undisputed that the plaintiff had provided the services it contracted to provide. Nevertheless, the State Highway Department withheld $534,000 it owed the plaintiff under the terms of the contract. The trial court entered a judgment against the State Highway Department for $534,000. On appeal, the State Highway Department argued that, on the basis of sovereign immunity, it could not be made to pay the judgment. 586 So.2d at 875. In affirming the judgment, this Court stated:
“Once the Highway Department has legally contracted under state law for goods or services and accepts such goods or services, the Highway Department also becomes legally obligated to pay for the goods or services accepted in accordance with the terms of the contract. It follows that this obligation is not subject to the doctrine of sovereign immunity and is enforceable in the courts.”
586 So.2d at 875 (emphasis added). Thus, because the State Highway Department *127 had already received the benefits of its contract with the plaintiff, an action seeking to compel payment for the services was an action seeking to compel State officers to perform their legal duty, i.e., an action under the first “exception” to § 14 immunity.
In Marous Brothers, the District Court for the Middle District of Alabama reached the same conclusion as did this Court in Milton Construction. In Marous Brothers, the plaintiffs had contracted with ASU to provide preconstruction services. The plaintiffs provided the services and submitted invoices to ASU for payment, but ASU refused payment. The plaintiffs sued, alleging breach of contract, and ASU, claiming sovereign immunity, filed a motion to dismiss. In denying ASU’s motion, the federal district court referenced Milton Construction and held that § 14 did not bar the plaintiffs’ claims because “the allegations establish that ASU legally contracted under state law for services and accepted such services and, thus, is legally obligated to pay for the services accepted under the terms of the agreement.” 33 F.Supp.2d at 1201 (emphasis added). Thus, the takeaway from Milton Construction and Marous Brothers is that once the State has contracted for services and has accepted those services, it is legally obligated to pay for those services, and a claim seeking to enforce that legal obligation falls within the parameters of the first “exception” to § 14 immunity. In this case, Danley did not sue ASU seeking payment for services he had provided. Rather, he sought—and the trial court awarded—backpay from the date of the termination of his employment through the contract-end date, i.e., that period in which Danley was not providing services to ASU. Accordingly, Milton Construction and Ma-rous Brothers offer no support for Dan-ley’s argument.
Finally, Danley argues that § 14 does not immunize those ASU officials sued in their official capacities from either the contract award or the wrongful-withdrawal award because, he contends, those ASU officials, both in terminating his employment and in withdrawing the December 2012 pay from his bank account, acted “fraudulently, in bad faith, beyond authority, or in a mistaken interpretation of law.” Danley’s brief, at 62. That is, Danley argues that the actions resulting in the damages awards fall within the parameters of the sixth “exception” to § 14 immunity. However, as Danley concedes, the sixth “exception” to § 14 immunity allows a plaintiff to bring claims for injunctive relief against State officials in their official capacities. Hampton, supra. The sixth “exception” provides ■ for monetary damages only against State officials in their individual capacities. Id.
Thus, Tucker, Ex parte Bessemer Board, Milton Construction, and Marous Brothers are distinguishable, rendering Danley’s attempts to analogize them unpersuasive. Accordingly, ASU and those ASU officials sued in their official capacities met their burden of showing that § 14 entitles them to immunity from the contract award and the wrongful-withdrawal award to the extent that those awards are based on Danley’s state-law claims. Section 14 immunity is more than a defense; when applicable, it divests the trial courts of this State of subject-matter jurisdiction. Colbert Cty. Bd. of Educ. v. James, 83 So.3d 473, 479-80 (Ala.2011) (quoting Patterson v. Gladwin Corp., 835 So.2d 137, 142-43 (Ala.2002)). Thus, as to ASU and those ASU officials sued in their official capacities, the trial court was without subject-matter jurisdiction over Danley’s state-law claims for damages and, therefore, could not award damages based on those claims. In the absence of subject- *128 matter jurisdiction, over claims, a trial court’s only action is to dismiss the claims; any other action by the trial court is void. Harris v. Owens, 105 So.3d 430, 435 (Ala. 2012) (quoting Ex parte Blankenship, 893 So.2d 303, 307 (Ala.2004), quoting in turn other cases). Accordingly, to the extent that the contract award and the wrongful-withdrawal award are based on Danley’s state-law claims and were entered against ASU and those ASU officials in their official capacities, those awards are void and must be vacated.
B. Knight and Harris in Their Individual Capacities
Knight and Harris are the only defendants against whom a judgment was entered in their individual capacities. As noted above, § 14 does not bar
“actions for damages brought against State officials in their individual capacity where it is alleged that they had acted fraudulently, in bad faith, beyond their authority, or in a mistaken interpretation of law, subject to the limitation that the action not be, in effect, one against the State.”
Moulton, 116 So.3d at 1141 (emphasis added). Danley argues that Knight and Harris, in their individual capacities, are not immune from either the contract award or the wrongful-withdrawal award because, he says, in terminating his employment and in withdrawing from his bank account his December 2012 pay, they acted “willfully, maliciously, fraudulently, in bad faith, beyond [their] authority, or under a mistaken interpretation of law.” Danley’s brief, at 72. Those allegations, however, are essentially irrelevant if the awards are, in effect, awards against the State. Accordingly, we must first determine whether the contract award and the wrongful-withdrawal award constitute awards against the State. If they do, the absolute immunity provided by § 14 extends to Knight and Harris in their individual capacities.
As noted above, “[a]n action is one against the [S]tate when a favorable result for the plaintiff would directly affect a contract or property right of the State, or would result in the plaintiffs recovery of money from the [S]tate.” Jones, 895 So.2d at 873 (quoting Shoals Cmty. Coll. v. Colagross, 674 So.2d 1311, 1314 (Ala.Civ.App.1995)) (emphasis added in Jones). Again, the judgment makes it clear that the contract award is an award of backpay. Awards of backpay are awards of compensatory damages that directly affect a contract right of the State or that result in the recovery of money from the State and, therefore, are barred by § 14. Ex parte Thomas, 110 So.3d 363, 368 (Ala.2012). Thus, regardless of the allegations concerning Knight’s and Harris’s conduct, the contract award is an award against the State; as a result, the trial court had no subject-matter jurisdiction to enter the contract award against any defendant based on Danley’s state-law claims. James, supra. Accordingly, the contract award must also be vacated to the extent it is based on Danley’s state-law claims and was entered against Knight and Harris in their individual capacities.[7]
*129 As we did with the contract award, we must also determine whether the wrongful-withdrawal award constitutes an action against the State. The judgment indicates that the trial court calculated the wrongful-withdrawal award by doubling Danley’s December 2012 pay.[8] However, the mere use of Danley’s monthly salary as a basis on which to calculate the wrongful-withdrawal award does not, in these circumstances, affect a contract right of the State. As noted earlier, it is undisputed that the December 2012 pay withdrawn from Danley’s bank account was redeposited into his account in February 2013. As a result, the wrongful-withdrawal award is not a recovery of Danley’s December 2012 pay, i.e., a recovery of backpay that would affect a contract right of the State. Thomas, supra. Danley had already received his December 2012 pay, albeit two months late. Rather, the wrongful-withdrawal award is an award in addition to Danley’s December 2012 pay for the allegedly wrongful withdrawal of that pay. Thus, that award neither affects a contract right of the State nor does it, if entered against Knight and Harris in their individual capacities, result in the recovery of money from the State. Therefore, as to the wrongful-withdrawal award, Knight and Harris in their individual capacities are not entitled to the absolute immunity provided by § 14. In the alternative, Knight and Harris argue that they are entitled to State-agent immunity from the wrongful-withdrawal award.
This Court set forth the test for State-agent immunity in Ex parte Cranman, 792 So.2d 392 (Ala.2000), a plurality opinion. A majority of this Court subsequently adopted the Cranman test in Ex parte Butts, 775 So.2d 173, 178 (Ala.2000). The Cranman test provides:
“A State agent shall be immune from civil liability in his or her personal capacity when the conduct made the basis of the claim against the agent is based upon the agent’s
“(1) formulating plans, policies, or designs; or
“(2) exercising his or her judgment in the administration of a department or agency of government, including, but not limited to, examples such as:
“(a) making administrative adjudications;
“(b) allocating resources;
“(c) negotiating contracts;
“(d) hiring, firing, transferring, assigning, or supervising personnel; or
“(3) discharging duties imposed on a department or agency by statute, rule, or regulation, insofar as the statute, rule, or regulation prescribes the manner for performing the duties and the State agent performs the duties in that manner; or
“(4) exercising judgment in the enforcement of the criminal laws of the State, including, but not limited to, law-enforcement officers’ arresting or attempting to arrest persons; or
“(5) exercising judgment in the discharge of duties imposed by statute, rule, or regulation in releasing prisoners, counseling or releasing persons of unsound mind, or educating students.
“Notwithstanding anything to the contrary in the foregoing statement of the rule, a State agent shall not be immune from civil liability in his or her personal capacity
*130 “(1) when the Constitution or laws of the United States, or the Constitution of this State, or laws, rules, or regulations of this State enacted or promulgated for the purpose of regulating the activities of a governmental agency require otherwise; or
“(2) when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law.”
Ex parte Cranman, 792 So.2d at 405.
“‘This Court has established a “burden-shifting” process when a party raises the defense of State-agent immunity.’ Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala.2006). A State agent asserting State-agent immunity ‘bears the burden of demonstrating that the plaintiffs claims arise from a function that would entitle the State agent to immunity.’ 946 So.2d at 452. Should the State agent make such a showing, the burden then shifts to the plaintiff to show that one of the two categories of exceptions to State-agent immunity recognized in Cramnan is applicable.”
Ex parte Kennedy, 992 So.2d 1276, 1282 (Ala.2008).
“Prior decisions of this Court state that ‘ “ ‘[t]he applicability of the doctrine of discretionary function [now called State-agent immunity] must be determined on a case-by-case basis, and it is a question of law to be decided by the trial court.”” Ex parte Sawyer, 984 So.2d 1100, 1106-07 (Ala.2007) (quoting Ryan v. Hayes, 831 So.2d 21, 28 (Ala.2002), quoting in turn Ex parte Davis, 721 So.2d 685, 689 (Ala.1998)).”
Suttles v. Roy, 75 So.3d 90, 99 (Ala.2010). Knight and Harris, as the State officials asserting a defense of State-agent immunity, carried the burden of showing that Danley’s claims arise from conduct that would entitle them to State-agent immunity. The evidence indicates the following pertinent facts concerning the withdrawal of Danley’s December 2012 pay from his bank account.
Alondrea Pritchett, “assistant vice president for business and financial and comptroller” at ASU, testified that ASU employees are paid monthly on the final working day of each month. Two or three days before each monthly pay date, Pritch-ett sends a “transmission file” to Regions Bank, the bank ASU uses to conduct its financial business. Each monthly transmission file contains the amount of pay to deposit into the bank account of each ASU employee who chooses to receive his or her pay via direct deposit. Pritchett testified that, if she ever transmits a file to Regions Bank in error, she telephones Regions Bank and asks that the transmission be “reversed,” that is, that the money be returned to ASU’s account so that any errors can be corrected before that month’s pay date and the transmission file can be resubmitted. Pritchett testified that there have been occasions where she has had to request that Regions Bank reverse a transmission so that payroll deductions that should have been made before transmission—but were not—could be made before the transmission file is resubmitted.
Pritchett testified that, after she made the December 2012 transmission to Regions Bank, her supervisor,' Freddie Gal-lot, former vice president for finance and former chief financial officer of ASU, instructed her to reverse the transmission because there were charges to Danley’s purchasing card for which ASU would need to be reimbursed and deductions from Danley’s pay would need to be made *131 pursuant to the purchasing-card-acknowledgment form. Pritchett testified that she had had no conversations with either Knight or Harris regarding the reversal of the December 2012 transmission.
Gallot testified that it was his. responsibility, once he learned Danley had been placed on administrative leave, to recover any money Danley owed ASU. Concerning Knight’s role in the reversal of the December 2012 transmission, Gallot testified:
“Q. Who told you to withdraw the money out of Mr. Danley’s account?
“A. I did that on my own. I instructed Ms. Pritchett to do that.
“Q. Okay. So if Ms. Pritchett would—■ perhaps said in the course of her deposition, that you told her that Dr. Knight advised you to do it, that would be inaccurate, wouldn’t it?
“A. It would be inaccurate. Because Dr. Knight doesn’t have to tell me to do an audit of any situation. And very definitely, he would not have to tell me that I have a responsibility to make certain that if there were outstanding issues involved with an employee, that I don’t—I don’t have to follow through on it.
“Q. Right.
“A. We may have had some conversations, some indirect conversations, but he never directed me to do that.”
Knight testified that he had no daily supervision of the comptroller’s office; that he had “absolutely nothing to do with” ASU’s general process of reversing transmissions; and that he had played “[a]bso-lutely no role at all” in the reversal of the transmission regarding Danley’s December 2012 pay, Knight testified that the only conversation he remembered having with Gallot about the money Danley allegedly owed ASU was that Knight told Gal-lot to do “whatever [he] need[ed] to do to collect the money.” Knight further testified that he gave Gallot no specific instructions on how to collect the money and stated that that “would be a business office decision.”
Harris testified that Gallot did not discuss with him the reversal of the transmission that included Danley’s December 2012 pay and that Gallot was not required to do so. Harris further testified that, like Knight, he had no knowledge of the reversal of that transmission and that he “[did not] know anything about the government ,.. taking [Danley’s] property.” Harris testified that he had heard the prior testimony regarding Danley’s December 2012 pay but that he “[did not] know what that means” and that he “[did] not have any individual knowledge that there was any raiding of any account.”
From the trial court’s finding in the amended judgment that the withdrawal of Danley’s December 2012 pay was “initiated by ... Knight, under supervision, direction, and control by the remaining defendants,” it appears as though—and the evidence supports the conclusion that—the trial court entered the wrongful-withdrawal award against Knight and Harris in their individual capacities based upon Knight’s role as Gallot’s immediate supervisor and Harris’s role as Knight’s immediate supervisor. This Court has held that the exercise of judgment in supervising personnel falls within the parameters of State-agent immunity. See Ex parte Spivey, 846 So.2d 322, 331-32 (Ala.2002) (noting that “[a] State agent is also immune from civil liability for exercising judgment in supervising personnel” and that a supe *132 rior’s supervision of personnel is a category “specifically included within the Cranman restatement of the rule governing State-agent immunity”); and Gowens v. Tys. S., 948 So.2d 513, 532 (Ala.2006) (“ ‘[B]ecause supervisory ... functions require constant decision-making, they are, for the most part, discretionary.’ ” (quoting Love v. Davis, 14 F.Supp.2d 1273, 1278 (M.D.Ala.1998))). Because any conduct on the part of Knight and Harris as to the withdrawal of Danley’s December 2012 pay from Danley’s bank account was in a merely supervisory capacity, Knight and Harris demonstrated that Danley’s claims arose from conduct that entitles them to State-agent immunity. Thus, the burden then shifted to Danley to show that an exception to State-agent immunity applies. Kennedy, supra.
In that regard, Danley argues that Knight’s and Harris’s conduct in connection with the withdrawal from his bank account of his December 2012 pay falls within the parameters of the second exception to State-agent immunity, that is, that their conduct was willful, malicious, fraudulent, in bad faith, beyond their authority, or under a mistaken interpretation of law. However, the only “conduct” of Knight or Harris that could conceivably be connected to the withdrawal of Danley’s December 2012 pay is Knight’s statement to Gallot to do “whatever [he] need[ed] to do to collect the money” necessary to reimburse ASU for charges on Danley’s purchasing card.
As to whether Knight’s statement to Gallot was made in a manner or for a purpose that would defeat his claim of State-agent immunity, Pritchett and Gallot both testified that, at the time Gallot instructed Pritchett to reverse the December 2012 transmission, Danley had unal-lowable charges on his purchasing card. Danley does not argue that there is any impropriety in ASU’s policy of using payroll deduction to deduct unallowable charges, nor does he dispute that he voluntarily signed the purchasing-card-acknowledgment form and that, in doing so, he submitted to that policy. Pritchett testified that, in the past, she has asked Regions Bank to reverse transmissions before the monthly pay date so that she could deduct from an employee’s pay any money the employee owed ASU. However, there is no evidence indicating that those reversals actually resulted in the withdrawal of salary from the bank accounts of other ASU employees. Thus, it appears that Knight, in instructing Gallot to do “whatever [he] need[ed] to do to collect the money,” was operating under the assumption that ASU had a valid claim against Danley and that the comptroller’s office had valid procedures by which to attempt to collect that money. Therefore, the evidence does not support the conclusion that Knight’s lone statement to Gallot concerning the money Danley allegedly owed ASU was made with any willful or malicious intent, in bad faith, for fraudulent purposes, beyond his authority, or in a mistaken interpretation of the law, despite the fact that the withdrawal was ultimately in violation of the law.
To be sure, this Court does not look favorably upon an employer’s seizure of money from its employee’s bank account without providing the employee due process. An individual’s right to be secure in his or her property is one of the most sacred rights afforded the citizens of this country by the Constitution of the United States, a right the importance of which can be traced back through this country’s history and to Magna Carta in the 13th century. See James W. Ely, Jr., The Guardian of Every Other Right: A Constitutional History of Property Rights 13 (Kermit L. Hall et al. eds., 3d ed. 2008) (“[C]olonial laws drew on the principles of Magna Carta to protect liberty and property rights. In words closely resembling those of Magna Carta, the Laws and Liberties of Massachusetts (1648) stated that *133 ‘no mans [sic] goods or estate shall be taken away from him ... unless it be by the vertue [sic] or equity of some expresse [sic] law of the Country.’ ”); Smith v. Smith, 254 Ala. 404, 409, 48 So.2d 546, 549 (1950) (“Of course it should never be forgotten that the right to control one’s property is a sacred right which should not be taken away without urgent reason.”). Nevertheless, the evidence indicates that Knight’s and Harris’s conduct in connection to the withdrawal from his bank account of Danley’s December 2012 pay entitles them to State-agent immunity, and the evidence does not support a conclusion that any limited conduct on Knight’s part falls within any one of the exceptions to State-agent immunity. Thus, Knight and Harris are entitled to State-agent immunity from liability for the wrongful-withdrawal award to the extent that award is based on Danley’s state-law claims.
Claims of State-agent immunity do not challenge a trial court’s- subject-matter jurisdiction. See Ex parte Coleman, 145 So.3d 751, 753 (Ala.2013) (noting that State-agent immunity is an affirmative defense); Moseley v. Commercial State Bank, 457 So.2d 967, 969 (Ala.1984) (noting that “[f]ailure to raise an affirmative defense prior to a judgment generally constitutes a waiver”); and Ex parte Siderius, 144 So.3d 319, 323 (Ala.2013) (noting that subject-matter jurisdiction cannot be waived). Thus, the trial court had subject-matter jurisdiction to enter the wrongful-withdrawal award against Knight and Harris in their individual capacities. However, because we have determined that Knight and Harris, in their individual capacities, are entitled to State-agent immunity from the claim on which that award was based, the judgment entering that award must be reversed to the extent that it is based on Danley’s state-law claims and was entered against Knight and Harris in their individual capacities.
II. Immunity from Liability Based on Federalr-Law Claims
A. ASU and the ASU Officials in Their Official Capacities
Despite providing ASU and those ASU officials sued in their official capacities immunity from Danley’s state-law claims, § 14 provides those defendants no immunity from Danley’s federal-law claims. James, 83 So.3d at 481 (quoting Abusaid v. Hillsborough Cty. Bd. of Cty. Comm’rs, 405 F.3d 1298, 1315 (11th Cir. 2005)). Rather, for ASU and those ASU officials sued in their official capacities, immunity for liability as to Danley’s federal-law claims derives from the Eleventh Amendment to the United States Constitution.
“ ‘It is clear ... that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment. This jurisdictional bar applies regardless of the nature of the relief sought.
“‘When the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself.... The Eleventh Amendment bars a suit against state officials when “the state is the real, substantial party in interest.” ’
“Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (quoting Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945) (citations omitted)).
“‘To ensure the enforcement of federal law, the Eleventh Amendment permits suits for prospective injunctive relief against state officials acting in violation of federal law. This standard allows courts to order prospective re *134 lief, as well as measures ancillary to appropriate prospective relief.’ Frew v. Hawkins, 540 U.S. 431, 437, 124 S.Ct. 899, 157 L.Ed.2d 855 (2004) (citations omitted). Claims for monetary relief against State officials in their official capacities are barred by the Eleventh Amendment. See Edelman v. Jordan, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (*“[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials are nominal defendants.’” (quoting Ford Motor Co., 323 U.S. at 464, 65 S.Ct. 347, overruled on other grounds by Lapides v. Board of Regents of Univ. Sys. of Georgia, 535 U.S. 613, 122 S.Ct. 1640, 152 L.Ed.2d 806 (2002))).”
Ex parte Retirement Sys. of Alabama, 182 So.3d 527, 537-38 (Ala.2015). Once again, Danley concedes that the Eleventh Amendment provides ASU with sovereign immunity for liability from his federal-law claims. However, Ex parte Retirement Systems makes it clear that the Eleventh Amendment also provides State officials sued in their official capacities with immunity from liability for damages based on federal-law claims. Accordingly, to the extent that the contract award and the wrongful-withdrawal award are based on Danley’s federal-law claims, those awards are due to be reversed as to ASU and those ASU officials sued in their official capacities.
B. Knight and Harris in Their Individual Capacities
Knight and Harris do not argue that they are entitled to Eleventh Amendment immunity for liability from Danley’s federal-law claims in their individual capacities; rather, they argue that they are entitled to qualified immunity from those claims. However, as to the contract award, we need not consider whether Knight and Harris are entitled to qualified immunity because, as discussed above, the contract award constitutes an award against the State, regardless of against whom that award is nominally entered.
“The Eleventh Amendment bars a suit against state officials when ‘the state is the real, substantial party in interest.’ Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945). See, e.g., In re Ayers, 123 U.S. 443, 487-492, 8 S.Ct. 164, 173-176, 31 L.Ed. 216 (1887); Louisiana v. Jumel, 107 U.S. 711, 720-723, 727-728, 2 S.Ct. 128, 135-137, 141-142, 27 L.Ed. 448 (1882). Thus, ‘[t]he general rule is that relief sought nominally against an officer is in fact against the sovereign if the decree would operate against the latter.’ Hawaii v. Gordon, 373 U.S. 57, 58, 83 S.Ct. 1052, 1053, 10 L.Ed.2d 191 (1963) (per curiam). And, as when the State itself is named as the defendant, a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief. See Cory v. White, 457 U.S. 85, 91, 102 S.Ct. 2325, 2329, 72 L.Ed.2d 694 (1982).”
Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 101-02, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (footnote omitted).
The United States Supreme Court has held that a State is “the real, substantial party in interest” “when the ‘“judgment sought would expend itself on the *135 public treasury or domain, or interfere with public administration,” ’ [Pennhurst,] 465 U.S., at 101, n. 11, 104 S.Ct. 900 (quoting Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963)).” Virginia Office for Prot. & Advocacy v. Stewart, 563 U.S. 247, 255, 131 S.Ct. 1632, 179 L.Ed.2d 675 (2011). “[T]he ‘general criterion for determining when a suit is in fact against the sovereign is the effect of the relief sought,’ Pennhurst, supra, at 107....” 563 U.S. at 256.
The nature of the contract award lends itself to the conclusion that as to that award the State is the real, substantial party in interest because satisfaction of the contract award will result in the payment of the remainder of Danley’s salary pursuant to his employment contract with ASU. Although both Knight and Harris signed Danley’s employment contract in their capacities as vice president and interim president, respectively, they were “merely the conduit[s],” Milton v. Espey, 356 So.2d 1201, 1202 (Ala.1978), through which Danley contracted with ASU.[9] In Danley’s complaint, Knight and Harris were also conduits—this time the conduits “ ‘ “through which [Danley] seeks recovery of damages from the State.”’” Moulton, 116 So.3d at 1131 (quoting Haley v. Barbour Cty., 885 So.2d 783, 788 (Ala.2004)). ASU, as the entity that contracted with Danley, was responsible for the payment of Danley’s salary. As a result, although the contract award, to the extent it is entered against Knight and Harris in their individual capacities, is not nominally an award against the State, “the decree would operate against the [State],” Pennhurst, 465 U.S. at 101, and would “expend itself upon the public treasury.” Stewart, 563 U.S. at 255. For those reasons, the contract award, regardless of against whom it is nominally entered, circumvents the Eleventh Amendment’s prohibition of suits against the State and, thus, must be vacated. To hold otherwise would violate “an integral part of the basic constitutional framework of our nation and a fundamental bulwark protecting the states’ sovereign dignity.” Alabama State Docks Terminal Ry. v. Lyles, 797 So.2d 432, 438 (Ala.2001).
However, as noted above, the wrongful-withdrawal award does not constitute an award against the State; thus, the Eleventh Amendment does not provide Knight and Harris in their individual capacities immunity from liability on the claim that resulted in that award. As to that claim, we must consider Knight and Harris’s argument that they are entitled to qualified immunity. Qualified immunity is a question of law for this Court to decide. Ansley v. Heinrich, 925 F.2d 1339, 1347 (11th Cir.1991). As discussed above, the evidence does not indicate that Knight and Harris engaged in any conduct related to the withdrawal of Danley’s December 2012 pay from his bank account, and it appears as though the trial court entered the wrongful-withdrawal award against Knight and Harris in their individual capacities based on their respective supervisory roles.
*136 ‘“It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability.’ Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir.2003) (internal quotation marks omitted). Instead, to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor’s actions and the alleged constitutional violation. Id.
“ ‘The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor’s custom or policy ... result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.’
“Id. (internal quotation marks omitted) (citations omitted). ‘The deprivations that constitute widespread abuse sufficient to notify the supervising official must be obvious, flagrant, rampant and of continued duration, rather than isolated occurrences.’ Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir.1999) (internal quotation mark omitted). In short, ‘the standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous.’ Cottone, 326 F,3d at 1360 (alteration in original) (internal quotation marks omitted).”
Keith v. DeKalb Cty., Georgia, 749 F.3d 1034, 1047-48 (11th Cir.2014).
In this case, there is no evidence indicating, and Danley did not allege, that either Knight or Harris directly participated in the withdrawal of Danley’s December 2012 pay from his bank account. Thus, in order to deny Knight and Harris qualified immunity as to this claim, there must exist a causal connection between Knight’s and Harris’s actions and the withdrawal of Danley’s December 2012 pay. One manner of establishing a causal connection is “ ‘when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so.’ ” Keith, 749 F.3d at 1048 (quoting Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir.2003)). ■ In this case, there is no evidence indicating, and Danley did not allege that there is, a history of widespread abuse in the comptroller’s reversal of transmission files to Regions Bank. Rather, the evidence supports the conclusion that the withdrawal of Danley’s December 2012 pay from his bank account, though unfortunate, was nothing more than the type of “ ‘isolated occurrence[ ],’ ” Keith, 749 F.3d at 1048 (quoting Hartley v. Parnell, 193 F.3d 1263, 1269 (11th Cir. 1999)), that is insufficient to hold a supervisor liable under a plaintiff’s § 1983 claim.
A causal connection may also be established by showing that “ ‘a supervisor’s custom or policy ... result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so.’ ” Keith, 749 F.3d at 1048 (quoting Cottone). However, the evi- *137 denee does not indicate that Knight’s statement to Gallot was made in connection with a custom or policy of Knight’s that would constitute a deliberate indifference to Danley’s constitutional rights or that the statement was made in connection with a custom or policy of Knight’s in any regard. In addition, the facts do not support an inference that Knight was directing Gallot to act unlawfully or that Knight knew that Gallot would act unlawfully. Because the submission of a transmission file to Regions Bank occurs two or three days before a monthly pay date, the reversal of a transmission file does not constitute a seizure of an employee’s property without affording due process if the reversal is made before the employee’s pay is deposited into his or her account. Of course, in this case, Danley’s December 2012 pay had been deposited into his account. However, the fact that Danley’s December 2012 pay was withdrawn under questionable circumstances does not necessarily support a conclusion that Knight’s statement to Gallot was made with deliberate indifference to Danley’s constitutional rights, nor do we interpret Knight’s statement to Gallot to be an instruction to act unlawfully. ASU has lawful procedures for collecting money ASU employees owe ASU. Knight’s statement can be interpreted as an instruction to Gallot to follow those lawful procedures just as logically as Danley interprets it as an instruction to Gallot to withdraw Danley’s December 2012 pay from his bank account. Accordingly, Knight’s statement, in and of itself, is simply not enough to meet the “ ‘extremely rigorous,’” Keith, 749 F.3d at 1048 (quoting Cottone), standard required to hold a supervisor liable for a subordinate’s questionable conduct.
Moreover, to hold a supervisor liable for a subordinate’s conduct requires a causal, not a casual, connection. Gallot’s testimony indicates that, even had he not discussed with Knight the money Danley allegedly owed ASU, he would have followed the same course of action because it was his responsibility to ensure that ASU recover any money its employees owe the university. Thus, it does not appear that Knight’s statement to Gallot had any bearing on Gallot’s decision to institute the reversal of the December 2012 transmission and, thus, did not have a causal effect on Gallot’s conduct.
In this case, there is no evidence indicating that Knight and Harris participated directly in the withdrawal of Danley’s December 2012 pay from his bank account, nor is there evidence indicating a causal connection between Knight’s actions and the withdrawal of that pay. Accordingly, Knight and Harris are entitled to qualified immunity for liability as to wrongful-withdrawal award. Thus, to the extent that that award is based on Danley’s federal-law claims, it must be vacated.
III. ASU’s Counterclaim
ASU argues that the trial court erred in denying its counterclaim seeking the recoupment of $5,390.17 for charges made on Danley’s purchasing card— charges that, ASU says, were not made in accordance with ASU’s purchasing-card policies and procedures. The trial court, in denying ASU’s counterclaim, found that the evidence regarding the counterclaim was “conflicting and confusing” and that ASU had failed to carry its burden of proving that it was entitled to recoupment. The evidence regarding the charges on which the counterclaim is based indicates the following.
Although it is unclear from the testimony, it appears as though most of, if not all, the charges on which the counterclaim is *138 based were charges made for Danley’s travel-related expenses. Pritchett testified that when an ASU employee must travel for university-related business, he or she will submit, before traveling, a travel-authorization form to his or her supervisor—who, for Danley, was Knight. Upon approval from the supervisor, the travel-authorization form is then submitted to the comptroller’s office for approval and is then forwarded to the vice president for business and finance or to the president of the university for approval, depending on whether the travel is in-state or out-of-state. Pritchett testified that, before March 2012, employees submitted a paper version of their travel-authorization forms; however, in March 2012, ASU began using PeopleSoft, a software program through which ASU employees submit electronic travel-authorization forms.
Upon returning from travel, an ASU employee who has been issued a purchasing card submits to the comptroller’s office receipts for charges made to the purchasing card while traveling. Generally, if the employee makes charges while traveling without an approved travel-authorization form, does not have receipts for charges made while traveling, or makes unauthorized charges while traveling, the amounts of those charges are payroll-deducted from the employee’s pay to reimburse ASU. Although Pritchett testified that all travel-authorization forms should be pre-approved, she testified that there are occasions when an employee will travel before receiving full approval and that the travel-authorization form will be approved after the travel has occurred. Although that process does not appear to have been problematic when ASU used paper copies of the travel-authorization form, Pritchett’s testimony indicates that traveling before obtaining approval can cause problems with a travel-authorization form submitted through PeopleSoft because, Pritchett testified, once the dates on the travel-authorization form have passed, the travel-authorization form becomes “stale-dated” in PeopleSoft. Once a travel-authorization form becomes “stale-dated,” it can no longer be approved; thus, according to Pritchett, the employee must resubmit the travel-authorization form for approval.
William James Walker, a certified public accountant, testified that ASU had employed Carr, Riggs, and Ingram, L.L.C., the accounting firm where Walker is employed, to perform auditing services for ASU. Walker testified that in August or September 2012—shortly after Danley was placed on administrative leave—Pritchett asked Walker to undertake, in addition to the auditing services Carr, Riggs, and Ingram was then performing, a “project” whereby Walker would summarize certain charges made to Danley’s purchasing card, charges for which Pritchett claimed to have either no approved travel-authorization forms or no receipts. Pritchett provided Walker with monthly credit-card statements from ASU’s Regions Bank account for the months of September 2010 through August 2012 as well as the travel-authorization forms and receipts she had received from Danley. Walker testified that the project essentially required Walker to attempt to “match” each charge made to Danley’s purchasing card to an approved travel-authorization form and receipt. Walker testified that, at times, it was difficult to match charges to an approved travel-authorization form because the dates of the charges on the purchasing-card statements did not always match the dates the charges were actually made. Pritchett corroborated Walker’s testimony that matching charges to an approved travel-authorization form could be difficult. If Walker could not match a charge to an approved travel-authorization form, he noted that charge and included it in a report to Pritchett. However, the fact that Walk *139 er included a charge in his report to Pritchett was not an indication that the charge had not been approved. Walker testified that the project “was just summary-type work” and was “only as good as the information that was provided to [him].” In other words, Walker’s report was not to be interpreted as a conclusion that Danley had unapproved charges on his purchasing card. Rather, Walker’s and Pritchett’s testimony indicates that the report Walker prepared was nothing more than a list of those charges Walker could not match to an approved travel-authorization form.
Based on Walker’s report, ASU initially sought the recoupment of $67,242.61 from Danley for allegedly unauthorized or unapproved charges. However, Pritchett testified that, in January 2013, she, Gallot, Danley, and the parties’ attorneys met to discuss Walker’s report. As a result of that meeting, Danley was to provide proof that the charges on Walker’s report had been approved, and, as he did, Pritchett would amend the report accordingly. Eventually, as Danley provided the necessary documentation, ASU reduced its counterclaim to $5,390.17. Pritchett testified that, of the charges constituting the amended counterclaim, most appeared to be from 2012 after ASU began using Peo-pleSoft for its travel-approval process. Although it is unclear, it appears from Pritchett’s testimony that, for the period covering the charges in Walker’s report, Pritchett either had paper copies of Dan-ley’s travel-authorization forms or had electronic travel-authorization forms in PeopleSoft that had not been “fully approved.” Pritchett also testified that some of Danley’s electronic travel-authorization forms, though in the PeopleSoft system, had been denied after Danley was placed on administrative leave because they had become stale-dated. Although Pritchett testified that employees may resubmit travel-authorization forms that have become stale-dated, she testified that Danley would not have been able to resubmit any denied travel-authorization forms after he was placed on administrative leave because he was no longer in the PeopleSoft system.
Danley testified that he always received Knight’s approval before travel and was told that as long as the travel-authorization form had Knight’s signature, Harris would approve it. That is, Danley could travel without being “fully approved,” and Harris would approve the travel-authorization form after the travel. Danley further testified that he submitted receipts for the charges forming the basis of ASU’s counterclaim, sometimes more than once, and that the comptroller’s office “apparently” lost them. Marilyn Wade, who worked as Danley’s assistant during his employment, testified that one of her duties as Danley’s assistant was to submit Danley’s travel-authorization forms and receipts to the comptroller’s office. Wade testified that there were occasions when someone from the comptroller’s office would call and inform her that Danley had not submitted travel-authorization forms or receipts for certain charges, despite the fact that Wade had submitted the documentation on Dan-ley’s behalf. Wade testified that there were “numerous” times she had to resubmit travel-authorization forms or receipts because the comptroller’s office had lost or misplaced those documents. Wade testified that during the time she worked for Danley, she never failed to provide the comptroller’s office with Danley’s travel-authorization forms and receipts. When asked if the comptroller’s office had ever lost the receipts an employee had submitted after traveling, Gallot testified that “probably over a period of time ... there [were] receipts or documents that were lost in the comptroller’s office.” Despite *140 Wade’s and Gallot’s testimony to the contrary, Pritchett adamantly testified that the comptroller’s office does not lose or misplace travel-authorization forms and receipts.
As noted above, the trial court found that the evidence regarding ASU’s counterclaim was “conflicting and confusing” and that ASU had failed to carry its burden of showing that Danley had made unapproved charges on his purchasing card. We agree. ASU’s system for approving travel is not a model of efficiency or organization. From the evidence presented, the trial court could have determined that Danley submitted travel-authorization forms before he traveled each time but that some of those travel-authorization forms had not been approved. ASU provided no rationale for why some of Danley’s travel-authorization forms were not approved in a timely manner or why they had been allowed to become stale-dated, and, although Pritchett’s testimony indicates that it is not uncommon for ASU employees to need to resubmit travel-authorization forms because they have become stale-dated, that was not an option for Danley once he was placed on administrative leave and removed from the Peo-pleSoft system. Thus, the trial court could have determined that Danley did what he was required to do in order to obtain approval for university-related travel but that ASU had inadvertently failed to approve the travel-authorization forms before Danley’s travel and, by placing Danley on administrative leave and removing him from the PeopleSoft system, had prevented Danley from resubmitting the travel-authorization forms.
In addition, the trial court could have determined that Danley submitted all of his travel receipts but that the comptroller’s office either lost the receipts or was unable to match the receipts to an approved travel-authorization form. Given Walker’s and Pritchett’s testimony that matching travel receipts to an approved travel-authorization form can be difficult, the trial court could have determined that the charges on Walker’s report were not necessarily unauthorized but that the complexity of matching the charges to an approved travel-authorization form left room for doubt as to whether Danley had actually made unauthorized charges on his purchasing card.
When a trial court has made findings of fact based upon ore tenus evidence, it is not within this Court’s province to reweigh that evidence. Ex parte J.W.B., 933 So.2d 1081, 1087 (Ala.2005). Rather, we will affirm the judgment based on those findings if they are reasonable and are supported by credible evidence. Kennedy, supra. There is credible evidence to support the trial court’s findings regarding ASU’s counterclaim. Given that evidence and the presumption of correctness afforded the trial court’s findings, we cannot say that the trial court’s determination that ASU failed to carry its burden of proof on its counterclaim is “‘clearly erroneous, manifestly unjust, or against the great weight of the evidence.’ ” Butler v. Butler, 193 So.3d 713, 715 (Ala.2015) (quoting Hart v. Jackson, 607 So.2d 161, 162 (Ala.1992)). Accordingly, we affirm the judgment insofar as it denied ASU’s counterclaim.

Case No. limU

On cross-appeal, Danley argues that because the trial court ruled in his favor on his § 1983 claims, he was entitled to reinstatement to his position as athletic director and, thus, that the trial court erred in refusing to order his reinstate *141 ment. In support of his argument, Danley cites Allen v. Autauga County Board of Education, 685 F.2d 1302 (11th Cir.1982); Reeves v. Claiborne County Board of Education, 828 F.2d 1096 (5th Cir.1987); and Williams v. Roberts, 904 F.2d 634 (11th Cir.1990), for the proposition that federal law provides for an employee’s reinstatement to his or her position where the facts indicate that the employee has been wrongfully discharged. However, Danley fails to recognize the distinction between those cases and his circumstances.
Danley correctly notes that in Allen and Reeves the Eleventh Circuit vacated and the Fifth Circuit reversed, respectively, judgments denying reinstatement to a wrongfully discharged employee and that in Williams the Eleventh Circuit affirmed a judgment awarding reinstatement to a wrongfully discharged employee. Allen, 685 F.2d at 1306; Reeves, 828 F.2d at 1103; and Williams, 904 F.2d at 639. However, in Allen, Reeves, and Williams, the evidence indicated that the employees had been wrongfully discharged because they had exercised their constitutional rights. That is, they were discharged for an improper reason. See Black’s Law Dictionary 561 (10th ed.2014) (defining “wrongful discharge” as “[a] discharge for reasons that are illegal or that violate public policy” (emphasis added)). Here, the trial court found that ASU’s termination of Danley’s employment did not comply with procedural due process or with § 16-50-23. Those findings reflect that ASU terminated Danley in an improper manner, not for an improper reason or purpose.[10] The distinction is significant.
The rationale behind reinstatement as a form of relief to a wrongfully discharged employee is that once the employee “ ‘establishes that his discharge re-suited from constitutionally impermissible motives,’ ” Reeves, 828 F.2d at 1101 (quoting P.A.C.E. v. El Paso Cty. Cmty. Coll. Dist., 730 F.2d 258, 268 (5th Cir.1984) (emphasis added)), he may be entitled to reinstatement as a means of deterring his employer from future retaliatory firings. Although we see the value in reinstatement as a deterrent against retaliatory firings, the trial court did not find, and neither the evidence nor the facts of this case indicate, that Danley’s employment was terminated for retaliatory purposes. Thus, if he was not terminated for retaliatory purposes, we fail to see how his reinstatement will operate as a deterrent against possible future retaliatory firings. Accordingly, we find Danley’s reliance on Allen, Reeves, and Williams unpersuasive, and we affirm the trial court’s judgment insofar as it refused to order Danley reinstated to his position as athletic director.
Danley also argues that because he prevailed on his § 1983 claims, he is entitled to attorney fees and expenses. 42 U.S.C. § 1988 provides, in pertinent part: “In any action or proceeding to enforce a provision of section[ ] ... 1983 ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney’s fee as part of the costs.... ”
In Hewitt v. Helms, 482 U.S. 755, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987), the United States Supreme Court addressed whether a party can lose on all claims and nevertheless bé a “prevailing party” for purposes of an award of attorney fees pursuant to § 1988:
“In order to be eligible for attorney’s fees under § 1988, a litigant must be a ‘prevailing party....’ Respect for ordinary language requires that a plaintiff receive at least some relief on the merits of his claim before he can be said to *142 prevail. See Hanrahan v. Hampton, 446 U.S. 754, 757 (1980). [The plaintiff] obtained no relief. Because of the defendants’ official immunity he received no damages award. No injunction or declaratory judgment was entered in his favor. Nor did [he] obtain relief without benefit of a formal judgment—for example, through a consent decree or settlement. See Maher v. Gagne, 448 U.S. 122, 129 (1980).... That is not the stuff of which legal victories are made. Cf. Hanrahan, supra, 446 U.S. at 758-759.
[[Image here]]
“... As a consequence of the present lawsuit, [the plaintiff] obtained nothing from the defendants. The only ‘relief he received was the moral satisfaction of knowing that a federal court concluded that his rights had been violated.... There would be no conceivable claim that the plaintiff had ‘prevailed,’ for instance, if the District Court in this case had first decided the question of immunity, and the Court of Appeals affirmed in a published opinion which said: ‘The defendants are immune from suit for damages....’”
Hewitt, 482 U.S. at 759-62.
In this case, Danley prevailed in the trial court on his § 1983 claims. However, because we now reverse the trial court’s judgment insofar as it awards damages and because the trial court did not award Danley any additional relief he sought, Danley has not prevailed on any of his claims. “A plaintiff ‘prevails’ ... ‘when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant’s behavior in a way that directly benefits the plaintiff.’ ” Lefemine v. Wide-man, 568 U.S. 1, -, 133 S.Ct. 9, 11, 184 L.Ed.2d 313 (2012) (quoting Farrar v. Hobby, 506 U.S. 103, 111-12, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992)). As the United States Supreme Court noted in Hewitt, if the trial court had, in addition to denying Danley injunctive relief, determined that ASU and the ASU officials were entitled to immunity from claims for damages and, thus, had not entered the damages awards, Danley would certainly have no logical argument that he was a prevailing party. It would border on the absurd to reach a different conclusion simply because Danley prevailed at the trial level but subsequently did not prevail at the appellate level.
At most, what is left of the trial court’s judgment is a declaration that Dan-ley’s constitutional rights were violated. However, even if we were to interpret that finding as an award of declaratory relief, “[a] declaratory judgment ... is no different from any other judgment. It will constitute relief, for purposes of § 1988, if, and only if, it affects the behavior of the defendant toward the plaintiff.” Rhodes v. Stewart, 488 U.S. 1, 4, 109 S.Ct. 202, 102 L.Ed.2d 1 (1988). Because the judgment provides Danley with no injunctive relief, and because we now remand the case for the entry of a judgment vacating the damages awards, the judgment will not modify the ASU officials’ behavior in a manner that will benefit Danley. Thus, Danley is not a “prevailing party” for purposes of § 1988 and is not entitled to an award of attorney fees or expenses.

Conclusion

In case no, 1140907, we reverse that portion of the judgment awarding damages *143 to Danley and remand the case with instructions for the trial court to vacate those awards. Because we reverse that portion of the judgment awarding damages, ASU and the ASU officials’ remaining issues as to the propriety of the damages awards are pretermitted. We affirm that portion of the judgment that denied ASU’s'counterclaim. In case no. 1141241, we affirm the judgment in its entirety.
1140907—AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PARKER and SHAW, JJ., concur.
MURDOCK and WISE, JJ., concur specially.
STUART, BOLIN, and MAIN, JJ., concur in the result.
MOORE, C.J., concurs in part and dissents in part.
1141241—AFFIRMED.
MOORE, C.J., and STUART, BOLIN, PARKER, and SHAW, JJ., concur.
MURDOCK, MAIN, and WISE, JJ., concur in the result.

. Boyd was not president of ASU when Dan-ley filed his complaint and thus was not named in Danley’s complaint. However, as Harris’s successor, Boyd, in her official capacity, upon her appointment as president of ASU, was automatically substituted for Harris, in his official capacity. Rule 25(d)(1), Ala. R. Civ. P. Harris remains a defendant in his individual capacity.

. Judge Hobbs later recused himself from the case and thus was not the judge who entered the judgment from which the parties appeal.

. The amended notice of appeal filed by ASU still lists ASU as the only appellant. However, the amended docketing statement lists as appellants each of the defendants that are subject to the trial court's judgment. It is obvious from a careful review of the record that all parties involved in this action, including Danley, commonly referred to all defendants as "ASU” during the course of this action. In light of ASU's motion to amend filed with this Court, the amended docketing statement, and the fact that each party unquestionably had notice that every defendant subject to the trial court’s judgment intended to appeal the judgment, we construe ASU's amended notice of appeal as properly naming each of the defendants below as the parties filing the appeal.

. Although Danley malees a passing argument that the wrongful-withdrawal award was proper as to those ASU officials sued in their official capacities, he neither cites authority to support that argument nor develops that argument in any meaningful way. Rather, as to the wrongful-withdrawal award, Danley focuses his argument on Knight’s and Harris’s liability in their individual capacities, an argument addressed infra.

. Hale necessarily calls into question the validity of Barger v. Jefferson, 372 So.2d 307 (Ala.1979), and Lauderdale County Board of Education v. Moore, 574 So.2d 811 (Ala.Civ.App.1990), cases cited by Danley as support for this argument that also affirmed awards of backpay for teachers whose employment had been illegally terminated.

. The board members actually appealed from the adverse judgment, but because that judgment did not resolve all issues and, thus, was not final but challenged an order denying a claim of immunity, this Court treated the appeal as a petition for a writ of mandamus. 68 So,3d at 788.

. A plaintiff who has an action against the State arising from his or her contract with the State may pursue those claims with the Board of Adjustment. Section 41-9-62, Ala.Code 1975, provides:
“(a) The Board of Adjustment shall have the power and jurisdiction and it shall be its duty to hear and consider:
[[Image here]]
"(4) All claims against the State of Alabama or any of its agencies, commissions, boards, institutions or departments arising out of any contract, express or implied, to which the State of Alabama or any of its agencies, commissions, boards, institutions or departments are parties, where there is claimed a legal or moral obligation resting on the state....”
(Emphasis added.) See also Ex parte Board of Dental Exam'rs of Alabama, 102 So.3d 368, 387 (Ala.2012) (" 'The Board of Adjustment has jurisdiction over claims against the state that are not justiciable in the courts because of the state's constitutional immunity from being made a defendant.’ ” (quoting Vaughan v. Sibley, 709 So.2d 482, 486 (Ala.Civ.App.1997))).

. The amended judgment indicates that, “on orders by officers of ASU,” $11,060, "less deductibles,” was withdrawn from Danley's bank account. Danley's account statement indicates that $8,015.48 was the amount deposited into and subsequently withdrawn from Danley's account. Thus, it appears as though the trial court arrived at a sum of $11,060 based on Danley’s gross pay for December ($11,016.67), rather than the net amount actually deposited into his account.

. In Milton v. Espey, both Milton and Espey were employees of the University of Alabama. 356 So.2d at 1202. Milton, seeking damages on multiple claims, filed a complaint against Espey in which he alleged that he and Espey had entered into an employment contract. Espey filed a motion to dismiss the complaint, alleging that Milton was employed by the University of Alabama; that his salary was paid by the University; and that there was no agreement that Espey would be responsible for Milton’s salary. The trial court entered a summary judgment in Espey’s favor as to all *136 claims. In affirming die summary judgment as to Milton’s contract and negligent-supervision claims—but not Milton’s fraud claim— this Court noted that Espey was "merely the conduit through which the University contracted with Milton” and that "Milton’s contract was in fact-with the University....” 356 So.2d at 1202-03. Thus, we determined that Milton’s contract and negligent-supervision claims, though nominally against Espey, came within the prohibition of § 14. 356 So.2d at 1203.

. Danley’s complaint includes claims alleging that ASU terminated his employment in retaliation for Danley's exercise of his First Amendment rights. However, the trial court denied all of Danley’s claims on which relief was not specifically granted in the judgment. Because Danley's First Amendment claims were not granted in the judgment, they were *142 denied. Danley does not argue on appeal that the trial court erred in refusing to grant him relief on his First Amendment retaliation claims. Thus, the alleged wrongful discharge of Danley concerns only the manner in which he was terminated from employment, not the reasons.